IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL NALL AND FLORA NALL | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 14-cv-2819 |
| BNSF RAILWAY COMPANY, NATIONAL CARRIERS' CONFERENCE COMMITTEE, UNITED TRANSPORTATION UNION, AND UNITED TRANSPORTATION UNION HEALTH AND WELFARE COMMITTEE | § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Michael Nall ("Mr. Nall") and Flora Nall ("Mrs. Nall") (collectively, "Plaintiffs"), and complains of BNSF Railway Company ("BNSF"), National Carriers' Conference Committee ("NCCC"), United Transportation Union ("UTU"), and United Transportation Union Health and Welfare Committee ("UTUHWC") (collectively, "Defendants"), and for their cause of action would respectfully show the Court as follows:

**I. SUMMARY AND NATURE OF THE LAWSUIT**

1. Mr. Nall's date of birth is July 6, 1951. He was diagnosed with Parkinson's disease in late 2010.

2. Mr. Nall has been employed by BNSF for over 41 years as a trainman, performing duties such as conductor, switchman, and brakeman.

1

3. In April 2012, BNSF forced Mr. Nall to go out on medical leave due to his Parkinson's. Despite several releases from multiple doctors on numerous occasions over the course of at least a year, all stating he could to return to work without restrictions, BNSF did not allow Mr. Nall to return to work.  Mr. Nall is still able, ready, and willing to return to work; however, BNSF has falsely indicated he is not qualified to return to work, despite the fact that all documentation and objective evidence indicates otherwise.  Instead, BNSF keeps pressuring Mr. Nall to file for disability benefits and retire, simply because of his diagnosis of Parkinson's disease, his age, and/or his filing of a charge of discrimination.  In fact, an EEOC investigator found that BNSF discriminated against Mr. Nall based on his age and disability.

4. Furthermore, although Mr. Nall is still an employee of BNSF, Plaintiffs are not receiving welfare benefits as are other employees and their beneficiaries.  Specifically, without any warning and contrary to representations Plaintiffs received and relied upon in late 2013, BNSF decided to terminate Plaintiffs' medical, prescription, vision, and dental benefits effective January 1, 2014 without any warning.  Although Defendants eventually agreed to reinstate Mr. Nall's medical and prescription benefits through the end of 2014, it did not reinstate his vision and dental benefits, and has refused to reinstate any of Mrs. Nall's welfare benefits, even though she is an eligible beneficiary.

5. Mr. Nall asserts claims for disability and age discrimination and retaliation under Chapter 21 of the Texas Labor Code, the Americans with Disabilities Act of 1990, as amended ("ADA"), and the Age Discrimination in Employment Act of 1967, as amended ("ADEA"). Plaintiffs also assert the following claims under the Employee Retirement Income Security Act of 1974 ("ERISA"): a) interference with ERISA rights under 29 U.S.C. § 1140; b) breach of fiduciary duty under 29 U.S. § 1132(a)(3); and c) ERISA estoppel.

## II. Parties

6. Plaintiff Michael Nall is an individual residing in Galveston County, Texas.

7. Plaintiff Flora Nall is an individual residing in Galveston County, Texas. Mrs. Nall is the wife of Mr. Nall.

8. Defendant BNSF Railway Company has a principal place of business in Harris County, Texas. BNSF Railway Company may be served with process by serving its registered agent, CT Corporation System, at 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

9. Defendant National Carriers' Conference Committee is a plan administrator of the applicable welfare plan(s) that apply to Plaintiffs. NCCC may be served with service through an administrator, agent, or officer at 1901 L Street, N.W., Suite 500, Washington, D.C. 20036.

10. Defendant United Transportation Union is a plan administrator of the applicable welfare plan(s) that apply to Plaintiffs. UTU may be served with service through an administrator, agent, or officer at 24950 Country Club Blvd., Suite 340, North Olmstead, OH 44070.

11. Defendant United Transportation Union Health and Welfare Committee is a plan administrator of the applicable welfare plan(s) that apply to Plaintiffs. UTUHWC may be served with service through an administrator, agent, or officer at 14600 Detroit Avenue, Cleveland, OH 44107.

## III. Jurisdiction and Venue

12. This Court has jurisdiction under 28 U.S.C. § 1331. Specifically, the claims brought under ERISA, the ADA, and ADEA involve federal questions. This Court also has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

13. Venue of this action is proper in this district and division under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants have a principal place of business in the Southern District of

Texas and/or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Southern District of Texas.

### IV.   CONDITIONS PRECEDENT

14. All conditions precedent to jurisdiction have occurred or been complied with.  A charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC") on or about December 20, 2012.  The EEOC mailed a Notice of Right to Sue letter on August 15, 2014.

### V.   FACTUAL BACKGROUND

15. Mr. Nall became an employee of BNSF on March 30, 1973.

16. Mr. Nall is still employed by the company, although he has not actually worked since mid-2012.

17. Throughout his employment, Mr. Nall generally worked as a trainman, in positions such as conductor, switchman, and brakeman.

18. In 2010, Mr. Nall was diagnosed with Parkinson's disease.  He temporarily went on medical leave, but quickly returned back to work.  BNSF required Mr. Nall to undergo periodic medical testing and submit information from his doctors regarding his medical condition.

19. Because of his Parkinson's, Mr. Nall requires periodic doctor visits and relies on prescription medications.

20. On April 11, 2012, BNSF involuntarily placed Mr. Nall on a medical leave of absence because he was allegedly observed "having difficulty getting on and off engines as a result of stumbling as well as displaying a lack of concentration when receiving mandatory directives from dispatchers."  As discussed in more detail below, despite numerous releases from multiple doctors, Mr. Nall was never allowed to return back to work after this date.

21. On April 20, 2012, Mr. Nall was initially placed on a 5-week long medical leave.

22. Also on April 20, 2012, Carol Wilks, BNSF's Manager of Occupational Health Services asked Mr. Nall if he was ready to retire.

23. On May 11, 2012, a neuropsychologist, Dr. Stephen Lippold, evaluated Mr. Nall and determined that Mr. Nall had no brain damage and that his memory and problem solving skills were average.

24. On May 16, 2012, a functional capacity evaluation of Mr. Nall was completed by Memorial Herman Healthcare Center and a finding issued that Mr. Nall is "able to meet the demands for various positions working for BNSF Railroad at this time."

25. On May 24, 2012, BNSF indicated it had concerns based on these evaluations and requested more information from his doctors before allowing him to return to work.

26. Interestingly, also on May 24, 2012, Wilks asked Mr. Nall if he was ready to retire because of his "degenerative disease." This comment suggests that BNSF had no intent to ever allow Mr. Nall back to work despite its requests that he obtain a release from his doctor.

27. On June 11, 2012, Mr. Nall's doctor, Dr. Joseph Jankovic, evaluated him and determined that he could return back to work.

28. On August 1, 2012, another doctor of Mr. Nall's, Dr. Nishith Majmundar, evaluated Mr. Nall and agreed with Dr. Jankovic's evaluation that Mr. Nall could return to work.

29. This decision was again confirmed on August 15, 2012, when Dr. Jankovic specifically confirmed that Mr. Nall could perform his job duties safely.

30. BNSF was provided with the releases identified above.

31. Despite these releases, on August 16, 2012 (literally one day after Dr. Jankovic confirmed that Mr. Nall could perform his job duties safely), BNSF acknowledged receiving Mr. Nall's doctors' evaluations, yet arbitrarily and unilaterally decided that Mr. Nall still could not

return to work. This decision was made without BNSF conducting its own evaluation of Mr. Nall. This was an adverse action taken by BNSF against Mr. Nall.

32. On September 21, 2012, Mr. Nall underwent an "onsite evaluation" at BNSF's request, apparently to determine if Mr. Nall could perform his job. On November 26, 2012 (over two months later) BNSF issued a written decision stating "we have determined that you are not at a point in your recovery to safely return to work at this time." Interestingly, in a later statement to the EEOC, BNSF falsely stated that the results of this evaluation indicated that Mr. Nall "demonstrated decreased balance while reaching, exhibited jerky gait pattern while standing and sitting," that his "motions were ridged especially in the lower extremities while completing tasks," and "there was increased lower extremity and instability with hand movements." Although these findings are vague and not true, they appear to be BNSF's attempt to describe potential symptoms associated with Parkinson's disease. Furthermore, even if these findings were true, nothing about them would prevent Mr. Nall from performing his job duties as a trainman. This is evident by BNSF's written descriptions of Mr. Nall's job duties.

33. Also, on October 29, 2012 (after the September 21, 2012 onsite evaluation, but before BNSF's written, unsubstantiated decision), Dr. Majmundar, specifically stated that Mr. Nall could go back to work **and that he had shown improvement**. BNSF completely ignored this decision/report.

34. In a November 2, 2012 phone call with Dana Dickey, BNSF's Manager of Environmental Health, Dickey stated to Mr. Nall that BNSF had no plans to ever let him come back to work and that the forms being sent to him for his doctors to complete were just being sent out as a courtesy. This was an adverse action taken by BNSF against Mr. Nall. She also asked Mr. Nall if he was ready to retire during this conversation.

35. On November 26, 2012, Dickey again asked Mr. Nall if he was ready to retire.

36. Not willing to back down, Mr. Nall went to see Dr. Jankovic, who again evaluated him and determined, on December 17, 2012, that Mr. Nall could safely perform his job duties and could return to work with no restrictions. Dr. Jankovic also indicated that Mr. Nall had "normal gait and balance." Accordingly, Dr. Jankovic completed a BNSF medical status form explicitly stating that there is "no evidence of gait or balance difficulties." This form was sent to BNSF, but it still refused to reinstate Mr. Nall. This was yet another adverse action taken by BNSF against Mr. Nall.

37. On December 20, 2012, Mr. Nall filed a charge of discrimination with the EEOC and TWC. During at least two conversations with Wilks, she informed him that she was aware of the charge of discrimination and had to be "careful" about what she said to him.

38. On January 8, 2013, after receiving and disregarding Dr. Jankovic's December 17, 2012 release, BNSF repeated its decision to prohibit Mr. Nall to return to work allegedly based on the September 21, 2012 onsite evaluation and the original April 2012 decision to place him on medical leave. This was also an adverse action taken by BNSF against Mr. Nall. Notably, BNSF did not seek to conduct its own individualized assessment of Mr. Nall prior to repeating this decision.

39. In the January 8, 2013 letter (about three weeks after Mr. Nall filed his charge of discrimination), BNSF indicated, for the first time, that Mr. Nall had violated safety rules during the September 21, 2012 onsite evaluation. Nothing in this letter discussed his doctors' subsequent releases to return to work.

40. On February 28, 2013, Dr. Majmundar again evaluated and determined that Mr. Nall could return to work.

41. On April 15, 2013, Mr. Nall's doctor again determined that he could return back to work with no restrictions. A BNSF Medical Status Form was accordingly filled-out on that day, specifically stating that Mr. Nall has "no balance or walking difficulties." Mr. Nall faxed the completed Medical Status Form to BNSF; however, it was again ignored by Defendants. BNSF did not reinstate Mr. Nall and did not seek to conduct its own medical assessment of Mr. Nall.

42. Instead, on January 30, 2014, BNSF issued a written statement that Mr. Nall had been determined to be medically disqualified from working, effective July 2, 2013. This was an adverse action taken by BNSF against Mr. Nall.

43. In fact, in its December 10, 2013 position statement to the EEOC, BNSF falsely represented that as of July 2, 2013, the company had not received any follow-up from Mr. Nall since approximately late 2012. As indicated above, that is not true.

44. An employer can rely on a "direct threat" defense to a disability claim. This means that there is "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). However, the "direct threat defense must be 'based on a **reasonable medical judgment** that relies on the **most current** medical knowledge and/or the best available objective evidence,' **and** upon an expressly '**individualized assessment** of the individual's **present ability** to safely perform the essential functions of the job,' reached **after** considering, among other things, the imminence of the risk and the severity of the harm portended." *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 86 (2002) (citing 29 C.F.R. § 1630.2(r)) (emphasis added); *see also Hickman v. ExxonMobil*, No. 10-cv-5175, 2012 U.S. Dist. LEXIS 189196, *19 (S.D. Tex. Sept. 27, 2012).


45. Although BNSF received numerous releases from more than one doctor regarding Mr. Nall's ability to work, it did not conduct individualized assessments, did not act reasonably, and kept referencing the September 21, 2012 onsite evaluation, which did not involve the use of any medical judgment. *See Hickman v. ExxonMobil*, No. 10-cv-5175, 2012 U.S. Dist. LEXIS 189196, *26 – 27 (S.D. Tex. Sept. 27, 2012).

46. On numerous occasions and without Mr. Nall's consent or prior knowledge, BNSF would unilaterally inform the Railroad Retirement Board that Mr. Nall apparently needed to be placed on disability leave. For example, the Railroad Retirement Board sent letters to Mr. Nall, requesting him to apply for disability and/or sickness benefits, on at least the following dates: May 31, 2012, November 28, 2012, July 18, 2013, December 13, 2013, and February 11, 2014. Mr. Nall never had (and still has) no intention to go out on disability leave or retiring.

47. On numerous occasions, BNSF representatives told Mr. Nall that he should retire. They also made arbitrary comments and assumptions about his Parkinson's diagnosis, assuming that the mere fact that he had the disease meant he could never work for BNSF again.

48. Although BNSF regarded Mr. Nall as disabled and/or was aware that Mr. Nall had a record of an impairment, it never offered him any accommodations or made an attempt to engage in the interactive process to determine whether there could be any reasonable accommodations that could be provided to him.

49. BNSF has very few trainmen who are in their late 50's or 60's. In fact, it is BNSF's practice and/or policy to encourage employees to retire by the age of 62, if not sooner. BNSF forced Mr. Nall to go out on medical leave when he was 61 years old. Mr. Nall has consistently wanted to return to work. He is currently 63 years old and is still able and willing to return to work.

9

50. **On July 10, 2014, the EEOC investigator concluded her investigation, finding that BNSF discriminated against Mr. Nall based on his age <u>and</u> disability.**

51. Based on Mr. Nall's employment with BNSF, Plaintiffs had medical, prescription, dental, and vision benefits (collectively, "welfare benefits"). Even though Mr. Nall was placed on forced medical leave in mid-2012, BNSF continued to contribute to Plaintiffs' welfare benefits without change because Mr. Nall was still employed.

52. NCCC, UTU, and UTUHWC had, and still have, fiduciary duties to Plaintiffs.

53. In late 2013, Plaintiffs received their annual enrollment package regarding their coverage for 2014 (similar to packages they had received annually for numerous years). According to this enrollment package, Plaintiffs did not need to submit anything in order to continue their coverage for 2014. Plaintiffs relied on this notification to assume that their welfare benefits would continue on just as in the past. This was the same procedure Plaintiffs followed in the past in order to continue with their welfare benefits.

54. In late January 2014, Mrs. Nall went to see a chiropractor. Soon after, she received a bill from the chiropractor notifying her that she had no medical coverage. Surprised at this notification, Mrs. Nall contacted BNSF and was told that all of Plaintiffs' welfare benefits had ended on December 31, 2013. This was contradictory to the information provided to Plaintiffs in late 2013, which they had relied upon. It appears BNSF may have instructed NCCC, UTU, and/or UTUHWC to no longer continue Plaintiffs' benefits.

55. Nevertheless, after much discussion, Defendants reinstated Mr. Nall's medical and prescription coverage; however, they did not reinstate his vision or dental coverage, and they did not reinstate any of Mrs. Nall's welfare benefits. As a result, this year Mrs. Nall has been completely uninsured and Mr. Nall has had limited benefits, different from other employees.

56. Furthermore, BNSF has informed Plaintiffs that Mr. Nall's medical and prescription drug coverage will end after December 31, 2014. This is the case even though Mr. Nall is still employed by BNSF.

57. Because of Mr. Nall's Parkinson's disease, it is extremely important that he continue obtaining medical and prescription drug insurance coverage. Therefore, Mr. Nall may need to seek injunctive and/or declaratory relief in the near future.

58. Defendants' actions were committed with malice.

## VI. ATTORNEY'S FEES

59. As a result of Defendants' actions, Plaintiffs have had to retain the undersigned attorney and incur reasonable and necessary attorney's fees.

## VII. CAUSES OF ACTION

60. Plaintiffs hereby incorporate, by reference, the preceding paragraphs as if fully set forth herein, and accordingly alleges the following causes of action.

### A. Disability Discrimination

61. Mr. Nall brings this claim of disability discrimination under both the ADA and the Texas Labor Code. *See* 42 U.S.C. § 12101 *et. seq.*; TEX LAB. CODE § 21.125.

62. Mr. Nall has a disability as defined under the ADA and Texas Labor Code. *See* 42 U.S.C. § 12102(1); Tex. Lab. Code. § 21.002(6). Specifically, Mr. Nall has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as have such an impairment by Defendants.

63. Mr. Nall's disability was a reason and/or motivating factor in BNSF's decision to: a) place him on medical leave, b) continue to keep him on medical leave, c) find him medically unfit to return to work, and/or d) refuse to reinstate him back to work.

### B. Failure to Accommodate

64. Mr. Nall brings this claim of disability discrimination under both the ADA and the Texas Labor Code based on BNSF's failure to accommodate his disabilities. *See* 42 U.S.C. § 12101 *et. seq.*; TEX LAB. CODE § 21.125.

65. Because Mr. Nall's medical condition was/is "open and obvious" and/or because BNSF was and is aware of limitations associated with Mr. Nall's medical condition, it had an obligation to attempt to provide reasonable accommodations for Mr. Nall so that he could perform his job duties.

66. BNSF did not engage in an interactive process with Mr. Nall to determine whether any reasonable accommodations could be provided to him.

### C. Age Discrimination

67. Mr. Nall brings this claim of age discrimination under both the ADEA and the Texas Labor Code. *See* 29 U.S.C. § 623(a); TEX LAB. CODE § 21.125.

68. Mr. Nall performed his job duties at or above BNSF's expectations and was qualified for his position.

69. Under Chapter 21 of the Texas Labor Code, an employee only needs to show that age was a motivating factor in his termination. *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 474, 480 – 82 (Tex. 2001). Mr. Nall's age was a "motivating factor" in BNSF's decision to place him on medical leave, continue to keep him on medical leave, find him medically unfit to return to work, and/or refuse to reinstate him back to work.

70. Under the ADEA, an employee must show that he was terminated because of his age. *Gross v. FBL Financial Services Inc.*, 129 S.Ct. 2343, 2352 (2009). BNSF's decision to place Mr. Nall on medical leave, continue to keep him on medical leave, find him medically unfit to return to work, and/or refuse to reinstate him back to work was because of Mr. Nall's age.

71. BNSF retains and hires trainmen younger than Mr. Nall.

72. BNSF treats trainmen younger that Mr. Nall more favorably than Mr. Nall has been treated.

73. BNSF acted with malice or with reckless indifference with respect to its treatment of Mr. Nall and by failing to comply with age discrimination laws.

74. BNSF has a practice of hiring and promoting younger employees simply because of their age over more qualified older employees.

75. BNSF willfully violated the ADEA.

### D. Retaliation

76. Mr. Nall brings this claim of retaliation under the ADA, ADEA, and the Texas Labor Code.

77. Because Mr. Nall filed a charge of discrimination against BNSF on or about December 20, 2012, BNSF retaliated against him when deciding to: a) continue to keep him on medical leave, b) find him medically unfit to return to work, and/or c) refuse to reinstate him back to work.

### E. Retaliation and/or Interference with ERISA rights under 29 U.S.C. § 1140

78. Plaintiffs bring this claim of retaliation and/or interference with ERISA rights under 29 U.S.C. § 1140.

79. Because Plaintiffs sought and/or seek benefits under a welfare plan, Defendants retaliated against them when deciding to: a) continue to keep Mr. Nall on medical leave, b) find him medically unfit to return to work, and/or c) refuse to reinstate him back to work.

### F. ERISA Breach of Fiduciary Duty under 29 U.S. § 1132(a)(3)

80. Plaintiffs bring this claim of ERISA breach of fiduciary duty under 29 U.S.C. § 1132(a)(3).

81. NCC, UTU, and UTUHWC have breached their fiduciary duties to Plaintiffs.

82. Even though Mr. Nall has been consistently employed by BNSF, Defendants are not providing Plaintiffs with the same benefits as required by their representations and/or applicable plan documents.

83. In the alternative, to any extent the relevant welfare plan does not provide for Plaintiffs to obtain necessary welfare benefits, Plaintiffs request that the Court change or reform the terms of the plan to account for the representations made to Plaintiffs in late 2013 indicating that their benefits would continue as in the past. *See CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1876 – 80 (2011); *Gearlds v. Entergy Servs.*, 709 F.3d 448, 452 (5th Cir. 2013).

84. Plaintiffs request that their welfare benefits be fully reinstated and continue unhindered, as other BNSF employees and their beneficiaries.

### G. ERISA-Estoppel

85. In the alternative, Plaintiffs bring a claim of ERISA-estoppel. *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 374 (5th Cir. 2008); *High v. E-Systems Inc.*, 459 F.3d 573, 579 (5th Cir. 2006); *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444 (5th Cir. 2005).

86. Defendants represented to Plaintiffs, prior to January 1, 2014, that their welfare benefits would continue as is into 2014. Plaintiffs relied on these representations. These representations turned out to be false.

87. Even though Mr. Nall is employed by BNSF, he is not fully insured, as other employees. Furthermore, Mrs. Nall (Mr. Nall's spouse and beneficiary) has no insurance coverage at all.

88. Mr. Nall has no vision and dental benefits. His medical and prescription benefits are set to terminate on December 31, 2014. He has Parkinson's disease and is in his early 60's, and he will need continuous medical treatment for the rest of his life, including periodic doctor visits and frequent prescription medication. Terminating his medical and prescription

insurance coverage at the end of 2014 is contrary to the representations made to him from mid-April 2012 onward.

89. Extraordinary circumstances exist in this situation because, as explained above, Mr. Nall is an especially vulnerable individual. Alternatively and/or in addition, Defendants acted in bad faith and/or misled Plaintiffs. *See Brown v. Aetna Life Ins. Co.*, 975 F. Supp. 2d 610, 625 – 26 (W.D. Tex. 2013).

90. Plaintiffs request that their welfare benefits be fully reinstated and continue on, at least as long as Mr. Nall is employed by BNSF.

91. Plaintiffs also request compensation for any and all out-of-pocket expenses they incurred as a result of not having the required and/or expected insurance benefits, as promised to them prior to January 1, 2014.

## VIII. JURY DEMAND

92. Plaintiffs demand a trial by jury on all issues that may be considered by a jury.

## IX. DAMAGES

93. As a result of the above mentioned actions, Plaintiffs seek the following damages:

   a. Back pay;

   b. Loss of benefits;

   c. Loss of earning capacity;

   d. Reinstatement or, in the alternative, front pay;

   e. Loss of enjoyment of life;

   f. Mental anguish and emotional distress;

   g. Compensatory damages;

   h. Punitive damages;

   i. Liquidated damages under the ADEA;

j. Continuation and reinstatement of all welfare benefits (including immediate injunctive and/or declaratory relief if necessary);

k. Any and all other damages and/or relief, equitable or otherwise, to which Plaintiffs may be entitled under federal law;

l. Reasonable and necessary attorneys' fees;

m. Court costs;

n. Prejudgment and post-judgment interest.

## X. PRAYER

Plaintiffs respectfully pray that Defendants be cited to appear and answer herein and that upon a final hearing of this action, judgment be entered for Plaintiffs against Defendants for damages in an amount within the jurisdictional limits of this Court, which shall include all above mentioned damages and any other relief, at law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

Dated: October 3, 2014                                    SUD LAW P.C.


*/s/ Nitin Sud*
Nitin Sud
State Bar No. 24051399
Federal ID No. 611307
4545 Mount Vernon Street
Houston, TX 77006
Phone: 832-623-6420
Fax: 832-304-2552

Attorney for Plaintiffs