United States District Court
Southern District of Texas

**ENTERED**

February 15, 2017

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL NALL, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-02819 |
| | § | |
| BNSF RAILWAY COMPANY, *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before the Court in the above-referenced cause are Plaintiff Michael Nall's ("Nall") Motion for Partial Summary Judgment, Doc. 38, Defendant BNSF Railway Company's ("BNSF") Motion for Summary Judgment, Doc. 39, and Nall's Objections to Evidence in Support of Defendant's Motion for Summary Judgment and Motion to Strike Such Evidence ("Motion to Strike"), Doc. 40. After considering the motions, responses, relevant law, and for the reasons outlined below, the Court overrules both parties' objections to the other's evidence, denies Nall's Motion to Strike, denies Nall's Partial Motion for Summary Judgment, and grants BNSF's Motion for Summary Judgment.

### I.   Background

This case arises from Nall's allegations that his employer, BNSF, (1) discriminated against him on the basis of his age and disability when the company placed him on medical leave and refused to reinstate him despite receiving numerous medical releases from his doctor, and (2) retaliated against him after he filed a charge of discrimination with the EEOC. Nall brings these claims of discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101–12213, Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621–634, and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code § 21.001–

21.556. Doc. 15 at ¶¶ 60, 66, 75.

Nall began his employment with BNSF in 1973. Doc. 38 at 12. During his tenure with the railroad, he performed a number of jobs that fell under the umbrella of "train service work," including the positions of conductor and switchman in the company's Galveston yard. Docs. 38 at 12, 39 at 5. In September 2010, Nall was diagnosed with Parkinson's disease and went on medical leave. Doc. 38 at 13. After receiving a number of materials from Nall's doctors and confirmation that he could perform his job duties without restrictions, BNSF allowed Nall to return to work. *Id.* Despite his diagnosis, he continued to work without complaint for the next year and a half. *Id.* at 14.

In the spring of 2012, Jeremiah Strong ("Strong"), one of the trainmasters who Nall reported to, shared his and Nall's coworkers' concerns about Nall's ability to safely perform his duties with the Galveston yard terminal manager, Jonathan Gomez ("Gomez"). Doc. 39-6. On April 11, 2012, Gomez told Nall that he was being placed on medical leave because he was "observed having difficulty getting on and off engines as a result of stumbling as well as displaying a lack of concentration when receiving mandatory directives from dispatchers." Docs. 38 at 14, 17, 38-23. Gomez memorialized this conversation in a letter that instructed Nall to contact Dana Dickey ("Dickey"), the field medical manager, so that her department could determine whether a medical evaluation would be necessary to assess his ability to work safely. Doc. 38-23. The following day, Carol Wilks ("Wilks"), BNSF's manager of clinical services, issued another letter to Nall, which stated that Nall's supervisor had contacted the medical department to request a fitness-for-duty review because he had concerns that Nall's Parkinson's was not controlled and posed a threat to his safety. Doc. 38-12. This letter requested a number of medical documents from Nall in order to "begin [the] fitness for duty evaluation." *Id.*

Over the next several months, Nall submitted a number of medical evaluations in compliance with the company's requests. Docs. 38-13, 38-15, 38-16, 38-30, 38-18. After reviewing the submitted reports, BNSF often requested further information. Docs. 38-14, 38-17. On August, 27, 2012, after reviewing all of these materials, BNSF's field medical officer, Dr. Sharon Clark ("Clark") sent an internal email suggesting that "[t]he most reliable way to determine whether [Nall's] condition has improved to the point that he would be safe to perform his job duties would be for him to demonstrate that he can perform the job duties, e.g., an onsite evaluation." Doc. 38-2.

On September 21, 2012, BNSF conducted the recommended onsite evaluation, known as a field test. *See* Doc. 38-3. Dickey; Kyle James ("James"), BNSF's then-superintendent of operations; Nall's union representative; and a third-party physical therapist were among those in attendance. Docs. 38-35 at 21, 38-36 at 9, 39-1 at 96, 39-7 at 6. Nall asserts he completed the test successfully because he displayed no concentration or stumbling issues, which were BNSF's original reasons for removing him from duty. Doc. 38 at 19–20. However, BNSF concluded that Nall "put his safety at risk during the field test" because he committed a number of safety violations known as "Deadly Decisions." Docs. 39-4 at 31–42, 39-7 at 33–34, 38-8 at 3. As a result, the company concluded that he should not be returned to active duty and informed Nall of its decision. Doc. 38-8 at 3.

On December 20, 2012, Nall filed a charge of discrimination and retaliation with the EEOC. Doc. 39-1 at 215. On the same day, he sent in an updated BNSF Medical Status Form ("MSF") from his primary treating physician, Dr. Jankovich ("Jankovich"), which stated that after evaluating Nall on August 15, 2012, and December 17, 2012, his work-status recommendation was "Full Duty (No Restrictions)." Doc. 38-19. On June 26, 2013, Nall sent in

another MSF, which again stated that Jankovich recommended full duty after a follow-up visit on April 15, 2013. Doc. 38-20. BNSF uploaded these documents to its employee case management system (OPUS), Doc. 38-7, but the parties sharply dispute whether they were meaningfully reviewed and acted upon by the BNSF medical team, Docs. 38 at 21, 42 at 5.

In June of 2013, Dr. Laura Gillis ("Gillis") replaced Clark as BNSF's field medical officer. Doc. 38-38 at 3–4. A month later, after reviewing Nall's file, Gillis determined that he should be "medically disqualified." Doc. 39-9 at 89. Nevertheless, Gillis and Dickey continued to discuss Nall's condition long after Gillis's initial disqualification decision. *See* Doc. 38-24. Nall also continued to send in medical information, including an October 2014 medical evaluation from Jankovich indicating that he believed Nall could return to work as well as a December 2014 evaluation. Docs. 43-1, 43-2. On December 9, 2014, BNSF offered Nall another field test because Jankovich's December 2014 evaluation "indicat[ed] a possible change in [his] clinical status." Doc. 39-1 at 212. On the basis of Nall's performance during this subsequent field test, however, BNSF again concluded that Nall was unsafe to return to work. Doc. 39-1 at 213–14.

As these events were unfolding, on October 3, 2014, Nall filed this case. Doc. 1. On November 11, 2014, he amended his complaint to remove two causes of action. Doc. 15. On September 16, 2015, this Court dismissed a number of Nall's remaining claims, leaving him with the three that are the subject of the pending cross motions for summary judgement: (1) disability discrimination under the ADA and TCHRA, (2) age discrimination under the ADEA and TCHRA, and (3) retaliation under the ADA, ADEA, and TCHRA. *See* Docs. 36, 38, 39. The parties have fully briefed the issues and the motions are now ripe for consideration.

## II. Legal Standard

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewed in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1996). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The movant initially bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact on which the nonmovant bears the burden of proof at trial. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 885 (1990) (citations omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. When the moving party makes an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact concerning every element of its cause of action in order to defeat the motion for summary judgment. *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998); *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994); *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). There is no genuine issue for trial if a rational trier could not find for the nonmoving party based on the evidence presented. *City Pub. Serv.*

*Bd.*, 40 F.3d at 712–13 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584–88 (1986)).

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (internal citation and quotation marks omitted) ("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1995) (quoting *Solo Serve Corp. v. Westtown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991) (for the party opposing the motion for summary judgment, " 'only evidence—not argument, not facts in the complaint—will satisfy' the burden."). Likewise, unsubstantiated assertions, conclusory allegations, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). Instead, the nonmovant must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001) (quoting *Celotex*, 477 U.S. at 324) (internal quotation marks omitted).

In ruling on a summary judgment motion, the court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant, but the court may not make credibility determinations or weigh the evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### III. Analysis

All three of Nall's remaining causes of action are contested in the parties' cross motions for summary judgment. *See* Docs. 38, 39. Nall only seeks summary judgment on his ADA claim. Doc. 38. BNSF, however, seeks summary judgment on all of Nall's remaining claims—disability

discrimination, age discrimination, and retaliation. Doc. 39. The parties also contest the admissibility of certain pieces of their opponent's evidence. *See* Docs. 40, 42. Because these are threshold questions, the Court will first address the admissibility disputes.

### A.  Motions to Strike[1]

Nall objects to and moves this Court to strike certain evidence from BNSF's Motion for Summary Judgment. Doc. 40.  BNSF responds that Nall's Motion to Strike is not properly before the Court because he failed to confer as required under Local Rule 7.1(D). Doc. 47 at 1–2. In the alternative, BNSF contends that Nall's arguments are meritless for a number of reasons. *Id.* at 2–8. In its Response to Nall's Motion for Summary Judgment, BNSF likewise requests that the Court decline to consider certain evidence that Nall proffered with his Motion for Summary Judgment. Doc. 42 at 21–23.

The Court declines BNSF's invitation to deny Nall's motion on the ground that he failed to confer. To begin, the Court is not convinced such failure is not covered by the exceptions listed in the local rules. *See Burks v. Metro. Lloyds Ins. Co.*, CIV.A. H-14-591, 2015 WL 4126654, at *6 (S.D. Tex. July 8, 2015) (concluding that a motion to strike included in a reply to a Rule 56 motion was covered by the local rules' exception to the requirement to confer for Rule 12(f) motions). However, to the extent it is not, the Court concludes Nall's failure to confer is excusable in this case because objection by BNSF was foreseeable and the railroad was afforded a full opportunity to file a reply in opposition before the Court took up Nall's motion. *See Florer v. Elec. Data Sys. Corp.*, CIV. 303CV1175H, 2004 WL 1562851, at *2 (N.D. Tex. July 13, 2004) ("[T]he Court finds that the failure to confer on [a motion to strike] is excusable, as the

---

[1]The Court construes BNSF's request to ignore evidence Nall submitted with his Motion for Summary Judgment as a motion to strike even though BNSF's request was raised in its response to Nall's motion rather than in a formal motion. *See* Doc. 42 at 21–23.

opposing party can be expected to object . . . ."). Moreover, because BNSF has "failed to present any evidence that [Nall's] noncompliance was willful" and "Federal Rule of Civil Procedure 83 prohibits such a harsh result when a party nonwillfully fails to comply with form requirements," the Court refuses to impose such a harsh sanction.[2] *Sampson Indus., Inc. v. Amega Indus., Inc.*, CIV.A.3-98-CV-1440-P, 1998 WL 826907, at *1 (N.D. Tex. Nov. 18, 1998). Accordingly, the Court will instead address each piece of contested evidence in turn.

### i.   Jeremiah Strong's Declaration

Nall first argues that Strong's entire declaration should be struck because BNSF did not identify him as a witness until one month after the discovery deadline and BNSF has not shouldered its burden to show that this failure to disclose was substantially justified or harmless as required by Fed. R. Civ. P. 37(c)(1). Doc. 40 at 2–3. In the alternative, Nall requests the Court to strike portions of Strong's declaration that contradict Gomez's testimony, are irrelevant, or constitute inadmissible hearsay. *Id.* at 3.

With regard to Strong's declaration, BNSF initially responds that it is admissible in its entirety and properly before the Court for two reasons. Doc. 47 at 2. First, BNSF properly described Strong in its initial disclosures. *Id.* Second, Strong was identified long before the discovery period ended when Gomez testified that Strong was the one who had reported to him that Nall's coworkers had concerns about Nall's condition. *Id.* Moreover, BNSF alleges that Nall cannot credibly contend that he did not know that Strong had relevant information until after discovery closed on September 25 because (1) Nall served discovery requests specifically mentioning Strong by name in August, and (2) Nall's counsel contacted Strong in early

---

[2] Federal Rule of Civil Procedure 83 states that "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply."

September. *Id.* at 2–3.

BNSF also opposes Nall's Motion to Strike because BNSF timely supplemented its disclosures after Nall's counsel contacted Strong directly, and Nall fails to allege how he is prejudiced by Strong's disclosure. *Id.* at 3–4. BNSF further alleges that there is no contradiction in Strong and Gomez's testimony because Gomez simply stated that he did not recall whether Strong gave him specific information, while Strong did in fact recall giving specific information to Gomez. *Id.* at 4. With regard to the issue of relevance, BNSF responds that Strong's testimony is relevant because it demonstrates that Gomez had information regarding Nall's performance at the time Gomez decided to place Nall on leave, and is independent evidence bearing on the question of whether Nall was qualified. *Id.* at 5. Finally, BNSF argues that any reference to what Nall's coworkers told Strong about Nall's behavior are not hearsay statements because BNSF is only presenting those statements to explain why Strong took the actions that they did, not for the truth of the matters asserted. *Id.*

Rule 26(a) of the Federal Rules of Civil Procedure requires parties to identify witnesses and potential witnesses during the discovery period. Fed. R. Civ. P. 26(a). Rule 26(e) states:

> A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response: in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, *and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process* . . . .

Fed R. Civ. P. 26(e) (emphasis added). Rule 37(c)(1) goes on to explain that "[i]f a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In performing a Rule 37(c)(1) harmless-error analysis the court must look to four factors: "'(1) the importance of the evidence; (2) the prejudice to the

opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose.'" *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563–64 (5th Cir. 2004) (quoting *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

The Scheduling Order in this case designated September 25, 2015, as the discovery deadline. Doc. 25. On January 21, 2015, BNSF served its initial disclosures. *See* Doc. 47-1. Although Strong was not expressly named, the disclosures clearly stated that "[t]he persons identified in Plaintiffs' initial disclosures *or otherwise in discovery* may also have knowledge of facts supporting the defendant's defenses in this action. Defendant may use discoverable information from any such person in support of its defenses in this action." Doc. 47-1 at 2 (emphasis added). On July 29, 2015, Gomez was deposed. Doc. 40-2 at 1. At that time, Gomez testified that he received reports from Strong regarding Nall's condition. *Id.* at 2–7. As Nall admits, it was on the basis of these reports that Nall was initially placed on medical leave pending further evaluation. Docs. 38 at 17; 38-23. Moreover, the record confirms BNSF's claim that Nall served discovery requests listing Strong by name on August 21, 2015, Doc. 47-2 at 3–4, and Nall's counsel reached out to Strong in early September, Doc 40-1 at 1. As a result, the Court agrees that Nall was on notice that Strong was relevant to the case by early September at the latest and perhaps as early as July. In either case, Nall should have been aware of the potential that BNSF would use Strong's testimony to support its defenses before the September 25 discovery deadline. This is sufficient to overrule Nall's untimeliness argument. *See Allen v. Radio One of Texas II, LLC*, CIV.A. H-09-4088, 2011 WL 1527972, at *4 (S.D. Tex. Apr. 20, 2011) (citations omitted) (rejecting objections to a declaration because the plaintiff was aware of the contested individual and his relevance to the case), *aff'd sub nom. Allen v. Radio One of*

*Texas II, LLC*, 515 Fed. App'x 295 (5th Cir. 2013) (per curiam) (unpublished).

Nevertheless, even assuming that BNSF somehow ran afoul of the discovery rules, the Court concludes that the Rule 37(c)(1) harmless-error analysis favors admission. First, Strong's testimony is important since it goes to the rationale for BNSF's decision to place Nall on leave. Second, Nall has not alleged any prejudice by allowing the evidence (nor does the Court believe there is any—particularly because Nall should have been aware of Strong's relevance long before the discovery deadline). Third, any such prejudice could be cured by allowing Nall a limited opportunity to depose Strong. Finally, BNSF has adequately explained its failure to list Strong before its post-discovery amendment. There is, therefore, no reason to disregard Strong's declaration on the basis of untimely disclosure.

Turning to Nall's next argument for exclusion, the Court initially notes that neither party directs the Court to any cases that address whether and to what extent the contradictory testimony of two witnesses dictates exclusion. Nevertheless, the Court is not persuaded that when one witness indicates he does not recall the specifics of an event while another witness unequivocally states that he does remember the same event the Court must favor the testimony of the party with the inferior memory. Indeed, contradiction is inherent in disputes of this nature. It is not the Court's function to weigh the evidence or assess the credibility of witnesses at the motion-for-summary-judgment stage. *Liberty Lobby*, 477 U.S. at 249. Rather, the Court simply views the evidence with an eye toward determining whether a fact issue exists. *Id.*

The Court also overrules Nall's irrelevance argument. Nall states that "[e]ven if not contradictory, Strong's statements are irrelevant because there is no evidence from Gomez, the initial decision maker to remove Nall from service in April 2012, that he was aware of any of the allegations made by Strong at the time of the adverse decision." Doc. 40 at 3. To the contrary,

Gomez never stated unequivocally that he did *not receive* such information from Strong, only that he could *not recall* certain details of his conversation with Strong. Doc. 47-3 at 3. Moreover, Strong's contested declaration itself indicates that he gave Gomez information regarding Nall's condition in April 2012. Doc. 39-6 at ¶ 6. The Court further agrees with BNSF that Strong's declaration is highly relevant because "Strong's testimony also is independent evidence of Nall's performance at that time, and thus goes directly to the question of whether Nall is a 'qualified individual' under the ADA." Doc. 47 at 5.

As BNSF points out, Nall does not specifically identify what portions of Strong's declaration constitute hearsay. *See* Doc. 40 at 3. It is not the Court's duty to search through the evidence and "ferret out" objectionable statements. *Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 722 (N.D. Tex. 2006). However, to the extent that Strong's declaration contains statements that constitute hearsay, the Court does not consider such statements in reaching its conclusions on the motions for summary judgment. *See Salas v. Carpenter*, 980 F.2d 299, 304 (5th Cir. 1992) ("[T]he court should disregard only the inadmissible portions of a challenged affidavit." (citing *Williamson v. U.S. Dep't of Agriculture*, 815 F.2d 368, 383 (5th Cir. 1987); *Lee v. Nat'l Life Assurance Co. of Canada*, 632 F.2d 524, 529 (5th Cir. 1980)). As already discussed, in all other respects Nall's objections to Strong's declaration are overruled. His Motion to Strike Strong's declaration is, therefore, denied.

### ii. 2015 Evidence

Nall next asks the Court to strike all evidence and information regarding his February 2015 field test for two reasons: (1) it was not part of the EEOC proceedings, and (2) is not relevant to BNSF's potential liability because it is not evidence of BNSF's reasoning at the time the adverse decisions were made, namely, not reinstating Nall after the December 2012 and June

2013 MSFs were submitted. Doc. 40 at 3–4. Likewise, Nall moves to strike as irrelevant all evidence and information regarding all actions taken in 2015, including alleged attempts to accommodate Nall, because "this is not a failure to accommodate case," and BNSF's actions in 2015 are not relevant to the question of whether it complied with the law during the relevant time period: April 2012 until August 15, 2014. *Id.* at 4.

In an attempt to fend off Nall's exclusion efforts, BNSF contends that Nall's argument is actually contrary to his claims that BNSF's refusal to allow him to return to work was a continuing violation and illogical unless he is willing to concede that anything occurring after the December 20, 2012 filing of his EEOC complaint has no bearing on the case." Doc. 47 at 5–6. Further, BNSF urges that the 2015 evidence is consistent with what the company observed in 2012 and, therefore, supports BNSF's continued decision not to reinstate Nall. *Id.* at 6–7.

As BNSF points out, both Nall's EEOC charge, filed December 12, 2012, and his amended complaint, filed November 11, 2014, allege that BNSF was continuing to refuse to reinstate him. Docs. 16 at ¶ 62, 47-5. So does his motion for summary judgment. Doc. 38 at 10–11 ("Because of BNSF's *constant assumption* that Nall could not work as a result of his Parkinson's disease diagnosis, it regarded him as having a disability under the ADAAA and TCHRA *from April 2012 onward*." (emphasis added)) Furthermore, he seeks reinstatement. Doc. 16 at ¶ 90. Thus, evidence from 2015 is relevant to whether BNSF has continued to violate the ADA and ADEA in refusing to reinstate Nall and the Court refuses to strike the contested evidence. However, the Court does agree with Nall that such evidence is irrelevant to BNSF's rationale for initially placing Nall on leave and refusing to reinstate him soon after the December 2012 and June 2013 MSFs were received. Consequently, the Court overrules Nall's objections and denies his motion to strike all evidence from 2015. Nevertheless, the Court will only

examine the 2015 evidence to the extent it is relevant to the question of whether BNSF's alleged

discrimination is ongoing.

### iii.  Dr. Gillis's Declaration

In the alternative to striking all evidence related to 2015, including the February field test,

Nall asks the Court to strike the first sentence of paragraph six of Gillis's declaration, Doc. 40 at

5, which states:

> Based on my observations at the February 3 [2015] field test and my previous
> review of the medical and functional documentation concerning Mr. Nall in
> BNSF's possession, it is my medical opinion that from the time Mr. Nall was
> removed from service in April 2012 and continuing to the present, he would
> present a significant risk of substantial harm to the safety of himself and/or his co-
> workers if he were performing the train service position.

Doc. 39-3 at ¶ 6. Nall argues that Gillis lacks personal knowledge and the statement is

conclusory and irrelevant because she never met Nall until February 3, 2015. Doc. 40 at 5. Thus,

according to Nall, any statement from her as to Nall's condition prior to that date constitutes

improper speculation. *Id.*

BNSF responds that Gillis's statement is admissible for three reasons. First, it is relevant

to the basis for BNSF's refusal to reinstate Nall. Doc. 47 at 7–8. Second, Gillis explains in detail

the basis of her conclusion and expressly states that she reached her opinion after her personal

observation of Nall's 2015 field test and her review of his entire medical record. *Id.* Third, she is

both a fact and expert witness, thereby making her opinions admissible even if not based on

personal knowledge. *Id.*

The Court agrees with BNSF. The statement itself is clear—Dr. Gillis bases her opinion

on personal experience and an individual review of Nall's record. *See* Doc. 39-3 at ¶ 6. Although

Gillis reviewed Nall's record and made a determination regarding his fitness for duty on dates

prior to when she met him, there is nothing to indicate that an employer's records-review

physician need actually meet the employee in question before offering her medical opinion on the employee's fitness for duty based on the medical record before her. *See Hickman v. Exxon Mobile*, CIV.A. H-10-5175, 2012 WL 9100358, at *1 (S.D. Tex. Sept. 27, 2012), *aff'd sub nom. Hickman v. Exxon Mobil*, 540 Fed. App'x 277 (5th Cir. 2013) (stating that ExxonMobil's physicians reviewed plaintiff employee's medical records after she was placed on leave and giving no indication these physicians ever personally interacted with the employee). Moreover, as BNSF points out, as an expert, Dr. Gillis is entitled to express her opinions about matters beyond the purview of her personal experience. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of *or* personally observed." (emphasis added)). Finally, precisely because Nall argues that BNSF's discrimination is evident because the company did not meaningfully review his medical record—particularly the December 2012 and June 2013 MSFs—Gillis's testimony is relevant. Indeed, it addresses this question head on. Accordingly, Nall's objections are overruled and his motion to strike paragraph six of Gillis's declaration is denied.

### iv.  Dr. Jankovich's Declaration

BNSF takes aim at the last sentence of paragraph three, as well as the entirety of paragraphs four and five of Jankovich's declaration. Doc. 42 at 21. BNSF argues that these portions of Jankovich's declaration are inadmissible because they "contain expert testimony, and Nall has never disclosed Jankovich as an expert as required by Rule 26." *Id.*

Nall responds that:

Nall is not offering Jankovich as an expert witness, but is offering him only as a fact witness to show that BNSF did not act reasonably. It was partly his communications with BNSF that put the company on notice that Nall could work without restrictions; however, BNSF ignored such communications or otherwise failed to reasonably discuss with or seek clarification from him.

Doc. 43 at 9.

The Rules of Evidence permit parties to call a lay witness to give an opinion when it is rationally based on the witness's perception, helpful to a clear understanding of the witness's testimony or determining a fact in issue, and not based on scientific, technical, or other specialized knowledge governed by Rule 702. Fed. R. Evid. 701. Such "fact" witnesses are not governed by the Federal Rules of Civil Procedure's strict rules on expert-witness disclosure. *See* Fed. R. Civ. P. 26. However, when the opinion of an "expert" (i.e., one "who is qualified as an expert by knowledge, skill, experience, training, or education") is offered, Rule 26 mandates that the individual be disclosed during the discovery period. Fed. R. Evid. 702; Fed. R. Civ. P. 26(a)(2).

Here, Nall did not designate Jankovich as an expert witness during the discovery period. Accordingly, he may not use Jankovich's testimony in that capacity. Nevertheless, there is no bar to restricting a treating physician's testimony to factual testimony based on his own observations. *See, e.g.*, *Pizza v. United States*, CIV. A. 00-1391, 2001 WL 238216, at *3 (E.D. La. Mar. 5, 2001) (limiting testimony of treating physician not disclosed as expert witness to "testimony . . . based on his observations made while treating the Plaintiff."); *Sutton v. United States*, CIV. A. 91-1777, 1992 WL 116061, at *2 (E.D. La. May 6, 1992) (restricting physicians not disclosed as experts to factual testimony only). BNSF's objection to Jankovich's declaration is, therefore, overruled. However, Jankovich's testimony will be limited to those matters based on his own observations after treating Nall.

### B. Disability Discrimination Claim

#### i. The parties' contentions

Both parties seek summary judgment in their favor on Nall's disability discrimination

claim. In his motion, Nall argues there is no question of material fact that he has established the prima facie elements of his claim and BNSF's affirmative defenses of "direct threat" and "business necessity" do not apply. Doc. 38 at 10. With regard to the first element, Nall claims he is disabled because (1) he has a physical or mental impairment that substantially limits the major life activity of working, (2) BNSF regarded him as having a disability when it determined that he could not return to active employment status, and (3) BNSF has received substantial information regarding his medical condition and treatment since 2010, as evidenced by Nall's employment records. *Id.* at 23–25. As to the second element, Nall alleges that he is qualified for three reasons. First, he worked as a trainman for 37 years (including almost two years after his Parkinson's diagnosis and for one week after Gomez became aware of the complaints about Nall but had not yet removed him from duty). *Id.* at 26. Second, his 2012 field test did not focus on the essential duties of his position, and, therefore, is not evidence relevant to this element of his prima facie case. *Id.* at 26–27. Third, his doctor affirmed that Nall could safely perform his job duties after a number of post-leave evaluations, but BNSF failed to conduct an individualized assessment of Nall based on these reports. *Id.* at 27–28.

Nall also argues that he satisfies the third element of his prima facie case because he suffered adverse employment actions after he submitted the December 20, 2012 and June 26, 2013 MSFs from his doctor stating that he was able to return to work without any restrictions, namely, that BNSF did not evaluate the releases, relied on false information regarding the latter release, and did not follow its own policies with respect to considering reinstatement of Nall. *Id.* at 11. Finally, Nall argues that BNSF's affirmative defenses of "direct threat" and "business necessity" fail. *Id.* at 29–31. According to Nall, BNSF cannot avail itself of the direct-threat defense for two reasons: (1) the September 21, 2012 field test did not focus on Nall's essential

job functions and did not involve a medical analysis, (2) and BNSF did not conduct an individualized assessment each time Nall sent in his most current medical information. *Id.* at 29. Likewise, because BNSF "repeatedly changed its alleged requirements or information needed in order to continually prevent Nall from returning to work," BNSF has failed to demonstrate that it had a "uniformly applied" qualification that is "job related" or "consistent with business necessity." *Id.* at 30–31.

BNSF responds that it complied with the ADA in placing and keeping Nall on leave because BNSF did not remove Nall from work until it received reports regarding his ability to perform his job. Doc. 42 at 4. At that point, BNSF conducted an individualized assessment of his ability to safely perform the functions of his position by reviewing the information he submitted, instructing him as to what additional information it needed to reinstate him, and allowing him to participate in two field tests to demonstrate his ability to work safely. *Id.* BNSF also takes issue with Nall's assertion that he has established each element of his prima facie case and argues that the record demonstrates otherwise. *Id.* at 7–19.

BNSF directs its attacks to the second element of Nall's case, arguing first that Nall's subjective belief about his own abilities is insufficient to establish that he was qualified, particularly when it is contradicted by his own admissions and the testimony of others. *Id.* at 9–10. BNSF goes on to assert that it was not required to blindly follow the advice of Nall's doctor over the judgment of its own physician and personnel. *Id.* at 10–11. BNSF also contends that Nall's performance at the 2012 and 2015 field tests establish that he was not qualified. *Id.* at 11–15. More particularly, BNSF contends that the tasks Nall was asked to perform during the September 2012 field test were routine parts of his job, and therefore accurately measured his ability to perform the essential functions of his position. *Id.* at 14–15. BNSF also asserts that Nall

has mischaracterized the testimony of a number of BNSF's witnesses as to whether Nall was "qualified," and conflates "qualification" as defined under the ADA with "qualification" for a conductor certificate under the Federal Railroad Administration. *Id.* at 15–16. BNSF further avers that, contrary to Nall's assertions, the record indicates that it did in fact review the December 2012 and June 2013 MSFs, and even if Nall could prove otherwise, "overlooking two unremarkable medical records out of many does not constitute an ADA violation." *Id.* at 17–19. Finally, BNSF argues that has causation has not been demonstrated. *Id.* at 17–18.

With regard to its affirmative defenses, BNSF argues that the burden to establish the direct-threat defense lies with the plaintiff and Nall has failed to carry his burden here. *Id.* at 19. To the extent the Court disagrees with BNSF's characterization of burden allocation and concludes it lies with BNSF instead, the company argues that Nall is still not entitled to summary judgment because he has not shown that BNSF did not consider the disputed MSFs. *Id.* at 19–20. Moreover, BNSF urges that the record demonstrates, and Nall fails to refute, that it did consider all applicable information and made a reasonable medical judgment of Nall's ability to perform his job. *Id.* at 19. BNSF next argues that Nall's argument regarding "business necessity" is "somewhat confusing, because the defense generally applies when an employer uses 'qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability,'" and "[h]ere, the only such qualification standard is the requirement that an employee not pose a direct threat to the health and safety of himself, his co-workers, and the public." *Id.* at 20 (quoting 42 U.S.C. § 12113(a)). Nevertheless, to the extent it applies, BNSF argues that Nall "presents no evidence that working safely is not job-related and consistent with business necessity." *Id.* at 20–21.

Nall replies that BNSF failed to address the cases Nall cites for support, ignores the

actual standard of the "direct threat" affirmative defense, and inappropriately argues that the business-necessity defense incorporates the direct-threat defense. Doc. 43 at 6. Further, Nall attacks the evidence on which BNSF relies (arguments that the Court has already addressed). *Id.* at 6–8. To the extent the Court considers such evidence, Nall points to Gillis's testimony as evidence that the contested MSFs were not reviewed as required by BNSF policy, and cites alleged discrepancies in Gillis's testimony to show that BNSF's decision was not reasonable. *Id.* In his Supplemental Reply, Nall calls the Court's attention to *EEOC v. BNSF Ry. Co.*, Ca. No. C14-1488 MJP, 2016 U.S. Dist. LEXIS 2557 (W.D. Wash. Jan. 8, 2016). Doc. 50. Nall then argues that *EEOC* supports automatic liability against BNSF for failure to review the contested MSFs in this case because the *EEOC* judge found BNSF automatically liable because it never reviewed the results of an MRI it had requested from the plaintiff before taking an adverse employment action against him. *Id.* at 3. Nall also contends that language within the *EEOC* opinion supports his arguments that "1) 'evidence' created by BNSF after this lawsuit was filed is irrelevant; 2) Nall was a 'qualified individual;' and 3) BNSF cannot prove its 'direct threat' defense." *Id.* at 4.

Because Nall's Supplemental Reply was filed without leave of the Court and raises new issues not addressed in his underlying brief, if the Court chooses to take notice of it BNSF asks the Court to consider its Supplemental Response as well. Doc. 54 at 1. BNSF begins its Supplemental Response by asserting *EEOC* is inapposite because the "holding addresses a dispute solely about the ADA provisions applicable to medical examinations in the hiring context," and "has nothing to do with the ADA provisions that are applicable in the employment context." *Id.* at 2. BNSF also states that the court's holding conflicts with those of other courts. *Id.* at 3. Finally, BNSF argues that the case is distinguishable and/or inapplicable on the issues of

post-lawsuit evidence, qualification, and direct threat. *Id.* at 3–4.

### i. The legal framework

Title I of the ADA prohibits employers from discriminating against employees on the basis of physical or mental disability. Section 12112(a) of the statute specifically states that no covered entity may discriminate against a qualified individual with a disability on the basis of the disability in regard to "the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As part of its broad mandate against discrimination, the ADA also prohibits employers from requiring a medical examination or making inquiries of an employee as to whether he is an "individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity." *Id.* § 12112(d)(4).

To demonstrate ADA-prohibited discrimination, an employee may either present direct or circumstantial evidence. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (citing *Neely v. PSEG Tex., Ltd. P'Ship*, 735 F.3d 242, 245 (5th Cir. 2013)). "'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.'" *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 310 n.6 (5th Cir. 2004) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)). In contrast, if an inference is required for the evidence to be probative as to discriminatory animus in terminating the employee, the evidence is circumstantial." *Sandstad*, 309 F.3d at 897–98.

Where the plaintiff relies on circumstantial evidence to prove an ADA violation, courts apply the *McDonnell–Douglas* burden-shifting framework. *Cannon v. Jacobs Field Servs. N.A., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016) (citing *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009)). Under this framework, the plaintiff must first make out a prima

facie case of discrimination by showing: "(1) the plaintiff has a disability, or was regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of his disability." *Id.* (citing *LHC Grp.*, 773 F.3d at 697). Once an employee has established his prima facie case, the burden shifts to the employer to "'articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* (quoting *Chevron Phillips Chem. Co., LP*, 570 F.3d at 615).

If the employer meets this burden, the employee must then present evidence that the articulated reason is pretextual. *Id.* (citing *Chevron Phillips Chem. Co., LP*, 570 F.3d at 615). In determining pretext under the ADA, "'discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision making process and have a determinative influence on the outcome.'" *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503 (5th Cir. 2002) (alteration in original) (quoting *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 835 (5th Cir. 2000)). Thus, to meet the ADA standard, discrimination need only be a "motivating factor" in the adverse employment decision. *Maples v. Univ. of Tex. Med. Branch*, 524 Fed. App'x 93, 95 (5th Cir. 2013) (per curiam) (unpublished) (internal quotation marks omitted) (quoting *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008)). Notwithstanding this relaxed causation standard, a plaintiff's subjective belief that he was discriminated against is insufficient to establish a prima facie case of discrimination under the ADA. *Vasquez v. Nueces Cnty.*, 551 Fed. App'x 91, 94 (5th Cir. 2013) (per curiam) (unpublished) (citing *Baltazor v. Holmes*, 162 F.3d 368, 377 n.11 (5th Cir. 1998)).

### i.  Analysis

#### a.  Direct evidence

"Where a plaintiff offers remarks as direct evidence, we apply a four-part test to

determine whether they are sufficient to overcome summary judgment." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)). To qualify as direct evidence of discrimination, workplace comments must be (1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the adverse employment action; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue. *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001) (quoting *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999)).

Here, Nall alleges that there is direct evidence of discrimination because Dickey, Gillis, and Wilks made comments suggesting that Nall's Parkinson's diagnosis precluded him from ever returning to work with BNSF. Doc. 41 at 10. Specifically, Nall states in his deposition that soon after his first field test, "[Dickey] said that they were just trying to be nice to me. That's why they sent me some paper work. But that I'd never go back to work for the Sante Fe again – BNSF." Doc. 41-14 at 13–14. Nall also points out that his wife testified that Wilks told her a week before the second field test that "people with Parkinson's don't get better. Their condition just gets worse of the years." Doc. 41 at 10 (citing Doc. 41-15 at 2–5). Nall's wife likewise testified that Gillis echoed Wilks's statement that "people with Parkinson's don't get any better." Doc. 41-15 at 5.

The Court concludes that these comments are insufficient to clear the hurdle for direct evidence of discrimination. First, although Dickey's alleged comment was close in proximity to the initial adverse employment decision, Dickey was not responsible for reviewing medical information to determine whether an employee was safe to return to work and she was not involved in determining fitness for duty for Nall. Doc. 38 at 15. With regard to Wilks's

comment, Nall's wife's testimony appears to indicate it was made long after the initial decision to place Nall on leave and the December 2012 and June 2013 MSFs failed to spur BNSF to reinstate Nall. *See* Doc. 41-15 at 2–5. Further, while Nall does allege that Wilks did fitness-for-duty evaluations, Nall does not allege that she had authority over the decision to place or keep him on leave. *See* Doc. 38. Wilks herself testified that she was not the one who (1) placed Nall on leave, (2) decided to conduct either the 2012 or 2015 field tests, or (3) made the decision to keep him on leave after the December 2012 and June 2013 MSFs were received. *See* Doc. 38-34. Finally, Nall admits that Gillis did not join BNSF until June 2013. Doc. 38 at 15. Accordingly, she could not have been involved in any adverse employment decisions prior to that date, namely, BNSF's April 2012 decision to place Nall on leave, and its decision not to reinstate him after receiving the December 2012 MSF. Moreover, Gillis's hire date places her comment—at the earliest—over a year from the initial decision to place Nall on leave and at least six months from BNSF's receipt of the December 2012 MSF. This is insufficient to satisfy the temporal-proximity requirement for using comments as direct evidence of discrimination. The only other adverse employment action that Nall complains of is the company's failure to reinstate him after the June 2013 MSF, but there is no indication that Gillis's alleged comment was made in proximity to this decision either. Even assuming that it was, however, the Court is not convinced that one comment along the lines of "[p]eople with Parkinson's don't get any better" evidences discriminatory animus without inference or presumption—even if it is medically inaccurate. In the absence of evidence demonstrating that these comments were proximate in time to BNSF's decision to place and keep Nall on leave or that Dickey, Wilks, or Gillis had authority over the complained-of adverse employment actions, this testimony does not constitute direct evidence of age discrimination. Consequently, Nall must proceed under *McDonnell Douglas*.

### b.  *McDonnell Douglas* Prima Facie Case

In the absence of direct evidence, Nall must establish (1) he has a disability, or was regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of his disability. *Cannon*, 813 F.3d at 590 (citation omitted). The Court addresses each element in turn.

### 1.  Disability

The threshold inquiry in a plaintiff's prima facie case is whether or not a plaintiff has a disability within the meaning of the ADA. *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998). A disability is defined as (1) a physical or mental impairment that substantially limits one or more of the major activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12101(1); 29 C.F.R. § 1630.2(g).

In order to prove the existence of a disability under the first prong of the disability definition, a plaintiff must offer evidence that an impairment "substantially limits the plaintiff's ability to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). A plaintiff seeking to proceed under the second prong—record of impairment—must show a history of (or misclassification of having) "an impairment that substantially limited one or more major life activities when compared to most people in the general population." *Id.* § 1630.2(k). The third prong requires a plaintiff to demonstrate that he was "subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." *Id.* § 1630.2(l).

The statute defines a major life activity in two ways. First, major life activities include, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating,

sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i). Second, a major life activity includes "the operation of a major bodily function." 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(i)(1)(ii). Such functions include, but are not limited to: the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(i)(1)(ii). Thus, a plaintiff can prove himself disabled if his ailment substantially limits either a major life activity or the operation of a major bodily function. *See Ball v. LeBlanc*, 792 F.3d 584, 597 (5th Cir. 2015) (concluding the district court erred in only considering whether plaintiffs were disabled under the first definition of disability).

Notably, the limitation that there must be a "substantial" impairment to "a major life activity" contained within the first two prongs is to be "construed broadly in favor of expansive coverage." 29 C.F.R. § 1630.2(j)(1)(i). Moreover, as the plain language indicates, for purposes of the third prong, "individuals who are 'regarded as disabled,' but who do not actually have a disability, need only show that they were subjected to an action prohibited by the statute, and no longer that the disability substantially limited them in a major life activity." *Bleiweiss v. Panduit Sales Corp.*, CIV.A. H-13-0080, 2015 WL 163819, at *10 (S.D. Tex. Jan. 13, 2015). Unlike the first two prongs, employers are not required to provide reasonable accommodations to those employees only "regarded as" having a disability in order to escape liability. *Ellis v. Educ. Comm'n for Foreign Med. Graduates*, CIV.A. H-14-2126, 2015 WL 3866728, at *5 (S.D. Tex. June 23, 2015) (citing ADA Amendments Act of 2008, Sec. 6 § 501(l)(h), 122 Stat. 3553, 3558).

Nall argues that he can avail himself of any one of the three disability prongs. Doc. 38 at 23–25. BNSF disputes that the evidence in the record demonstrates that Nall's Parkinson's

disease substantially affects a major life activity. Doc. 42 at 7. However, BSNF admits that Nall may be able to satisfy the record-of or regarded-as prongs with proper proof at a later date but takes issue with the "cursory approach in his motion," which is "not sufficient to do so at this time." *Id.*

After a thorough review of the record and case law, the Court is convinced that Nall has established disability under all three prongs of the definition. "Parkinson's disease [is] a progressive, degenerative disease of the nervous system that affects both motor and non-motor functions." *Wilson v. Phoenix Specialty Mfg. Co.*, 513 F.3d 378, 381 (4th Cir. 2008), *abrogated on other grounds by Young v. United Parcel Serv., Inc.*, 784 F.3d 192, 199 (4th Cir. 2015). The ADA is clear that the operation of the neurological system is a "major life function." *See* 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(i)(1)(ii). Moreover, a number of functions that are often affected by Parkinson's are specifically enumerated as "major life activities" in the ADA: walking, concentrating, speaking, thinking, communicating, interacting with others, and, most importantly, working. *See* 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i). Furthermore, as BSNF admits, the ADA's disability requirements are now more relaxed; an employee need only demonstrate that his condition affects an enumerated function to qualify under the first prong. *See Cannon*, 813 F.3d at 591 (concluding that summary judgment on the disability element of plaintiff's claim was proper because there was evidence in the record that his arm injury gave him considerable difficulty in the enumerated tasks of lifting and reaching).

Regarding the second prong, the record here also indicates that Nall has a documented history of Parkinson's in the BNSF system going back to 2010. *See* Docs. 38-7 (BNSF correspondence with Nall in 2010 regarding his condition), 38-8 (BNSF correspondence with Nall in 2010 regarding his condition), 38-9 (2010 BNSF MSF), 38-11 (BNSF correspondence

with Nall in 2010 regarding his condition), 38-25 (BSNF Complete Case Report from 2010–2015), Doc. 38-43 (BNSF correspondence with Nall in 2010 regarding his condition). Finally, putting the undisputed medical facts regarding the effect of Parkinson's and plain language of the definition of "major life activity" aside, Nall still demonstrates that he has a disability under the third prong. The record is replete with statements and documents indicating that BSNF believed that Nall's Parkinson's actually substantially limited major life activities—regardless of whether or not it actually did. *See, e.g.*, Doc. 38-12 (noting the company's concerns that Nall's medical condition may be interfering with his ability to safely perform his job, i.e., work); Doc. 38-17 (noting concerns with Nall's concentration after neuropsychological evaluation). This is sufficient for the Court to conclude that there is no genuine issue of material fact as to whether Nall has met the first element of his claim. *See, e.g.*, *Cannon*, 813 F.3d at 592 (concluding that email in which employer stated its belief that plaintiff could not perform job duties and enumerated certain "major life activities" within those duties was sufficient to demonstrate that employer regarded the plaintiff as disabled); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 230–31 (5th Cir. 2015) (concluding that plaintiff was "regarded as" disabled by her employer based on emails and testimony indicating company's awareness of plaintiff's condition).

## 2. Qualified

"A qualified individual" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In determining whether a person is "qualified," the court examines "(1) whether the individual meets the necessary prerequisites for the job, such as education, experience, skills and the like; and (2) whether the

individual can perform the essential job functions, with or without reasonable accommodation." *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 n.14 (5th Cir. 1997) (citing  42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m)).  Therefore, to avoid summary judgment the plaintiff must demonstrate "that he could either (1) 'perform the essential functions of the job in spite of [his] disability,' or (2) that 'a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of his job.'" *Cannon*, 813 F.3d at 592 (alterations in original) (quoting *LHC Grp.*, 773 F.3d at 697 and citing 42 U.S.C. § 12111(8)).

A function is "essential" if it bears "more than a marginal relationship" to the employee's job. *Chandler v. City of Dall.*, 2 F.3d 1385, 1393 (5th Cir. 1993), *holding modified on other grounds as discussed in Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002) (per curiam). "Fact-finders must determine whether a function is 'essential' on a case-by-case basis." *LHC Grp.*, 773 F.3d 688, 698 (5th Cir. 2014) (citing Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(n)).  According to EEOC regulations:

> Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement;  (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

*Crossley v. CSC Applied Techs., LLC*, 569 Fed. App'x 196, 198 n.1 (5th Cir. 2014) (per curiam) (unpublished) (quoting 29 C.F.R. § 1630.2(n)(3)(i)-(vii)).  An employee's past performance of the same job under the same conditions may also raise a question of fact as to whether he could perform the essential functions of the position. *See Huffman v. Turner Indus. Grp., LLC*, CIV.A. 12-1061, 2013 WL 2244205, at *12 (E.D. La. May 21, 2013) (determining that fact issue existed

as to whether plaintiff was qualified because he performed the same job for six years without incident).

Only if the court determines that the plaintiff cannot perform the essential functions of the job does the court consider whether a reasonable accommodation by the employer would enable him to perform those functions. *Chandler*, 2 F.3d at 1393–94. The ADA requires that the employer and employee engage in an interactive process to identify a reasonable accommodation. *Chevron Phillips Chem. Co., LP*, 570 F.3d at 622. The ADA defines "reasonable accommodations" to include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). However, the ADA does not require an employer to transfer from the disabled employee any of the essential functions of his job in order to make reasonable accommodation for his disability. *Barber v. Nabors Drilling, USA, Inc.*, 130 F.3d 702, 709 (5th Cir. 1997).

Here, Nall argues that he was qualified because he had held the same position for 37 years, including for two years after his diagnosis with Parkinson's, and "was doing fine." Doc. 38 at 14 (citing Doc. 38-40 at 3). He further argues that BNSF cannot show that he was unable to perform his job duties. *Id.* In support of this contention, he claims that the medical evaluations that the company required him to undergo in May 2012 and the subsequent field test in September of that year were unrelated to determining whether he could perform his essential duties. *Id.* at 27. Importantly, Nall alleges that the tasks he was evaluated on during the field test were not referenced in any pre-field-test written job description or referenced as essential

functions. *Id.* In fact, he argues, the company changed its job description from one that did not reference making quick leg and hand movements, climbing on/off equipment, riding on moving cars while holding onto a ladder, or maintaining good balance and steadiness—reasons the company cited for refusing to reinstate him after the 2012 field test—to one that did in order to preclude him from qualifying for the position. *Id.* at 13. Furthermore, Nall points to Gomez's testimony that an employee may commit a Deadly Decision yet still be qualified to work as a conductor. *Id.* at 27. Finally, Nall contends that BNSF's determination that he was not qualified is undercut by the fact that it did not evaluate the MSFs or medical information he submitted in December 2012 or June 2013, both of which indicated that he could return to work without restrictions. *Id.*

BNSF responds that Nall's testimony that he was able to do his job just fine is simply his own subjective belief and, therefore, insufficient to establish that he was qualified as a matter of law. Doc. 41 at 9. Furthermore, BNSF alleges that Nall's testimony is belied by the fact that he admitted to engaging in at least some of the behaviors that BNSF contends constituted violations of its safety rules in his deposition and that there are other reports and observations that question his ability to perform the essential functions of his position in the record. *Id.* at 9–10. BNSF also argues that it was not required to blindly follow the advice of Nall's treating physician over the advice of its own doctors and personnel—whose own concerns with his abilities are documented within the record. *Id.* at 10. Further, BNSF responds that the May 2012 medical evaluations were directly related to the essential functions of the position, particularly his ability to think and move. *Id.* at 11. BNSF also alleges that the field test evaluated his ability to safely perform job-related functions and is "exactly the sort of individualized assessment required by the ADA." *Id.* at 12. Moreover, BNSF points out that "Nall cites no support for the proposition that only those

functions listed on a job description are essential, and in fact the text of the statute demonstrates that the opposite is true." *Id.* at 14–15. Finally, BNSF argues that Nall mischaracterizes Gomez's testimony that stumbling and lack of concentration do not disqualify an individual from working as a trainman because he conflates the concept of "qualification" under the ADA with the question of whether an individual can hold a conductor certificate under the Federal Railroad Regulations. *Id.* at 15.

Here, BNSF's original April 2012 letter notifying Nall of its decision to place him on leave stated that he was "observed having difficulty getting on and off engines as a result of stumbling as well as displaying a lack of concentration when receiving mandatory directives from dispatchers." Doc. 38-23. In May 2012, BNSF sent another letter stating that his medical evaluations raised a number of concerns regarding his balance and cognitive performance. Doc. 38-17. This letter also stated that these findings confirm what was observed by his coworkers and that "balance is essential to working safely as a brakeman/switchman/conductor." *Id.* It further noted that "in a rail yard an employee needs to be able to make quick decisions and take quick actions in order to work safely." *Id.* In an internal email sent August 27, 2012, BNSF again reiterated that the company had "safety concerns precipitated by lack of concentration and physically stumbling." Doc. 38-2. The email also concluded that because his treating physicians had indicated that he had been stable for over two months:

> The most reliable way of determining if the employeeÕs [sic] condition has improved to the point that he would be safe to perform his job duties would be for him to demonstrate that he can perform the job duties, e.g., an onsite evaluation. Unlike most onsite evaluations, this one would emphasize the cognitive abilities of the employee (along with the physical abilities which are more easily observed and documented).

*Id.*

The objective results from the 2012 field test, completed by a third-party physical

therapist, indicated that Nall had decreased balance; exhibited forced, jerky, and rigid movement

patterns, tremors, and a jerky gait pattern. Doc. 38-3. As a result, in a letter dated November 26,

2012, BNSF notified Nall that he was "not at a point in [his] recovery to safely return to work at

this time." Doc. 38-4. On January 8, 2013, BSNF sent another letter to Nall refusing to reinstate

him. Doc. 38-5. This letter cited concerns for the safety of Nall and others due to the problems

that he exhibited in that field test, particularly committing a Deadly Decision, giving a wrong

hand signal, and improperly dismounting equipment. *Id.*

The original job description that Nall cites as not mentioning any of BNSF's stated

reasons for removing him from service and not reinstating him after the field test was included in

his 2010 MSF and states:

> The Trainman operates various designs of track switches and derails (in order to
> change the route of the engine or cars within yards or on the road), applies and
> release hand brakes, and also observes or monitors track conditions, the railroad
> right-of-way, and passing trains. They inspect all train cars and other equipment
> before leaving the yard or when required. They also observe, interpret, and relay
> hand, lantern, and other signals affecting the movement of the train, and judge and
> control the speed and clearance distance of cars.

Doc. 38-9 at 2. The later, allegedly modified job description cited by Nall states that "[t]he

Switchman position is a safety critical and physically demanding position. The switchman has

the responsibility for the safe and efficient movement of freight and passenger trains." Doc. 38-1.

To that end, the description cites climbing on and off equipment safely; maintaining awareness

of the environment and responding quickly to any unsafe conditions; and maintaining good

balance and steadiness of stance/gait as some of the physical requirement of the position.

Admittedly, the job descriptions Nall provides do contain some differences, but the Court

is not convinced that makes any difference to the question of whether Nall was qualified as a

matter of law. First, as the ADA regulations make clear, an employer's stated job description is

not the only evidence of what constitutes an essential function. 29 C.F.R. 1630.2(n). Here, the record demonstrates that BNSF repeatedly stated that it deemed performing job tasks safely as essential to Nall's position. Moreover, although the 2010 MSF's job description does not expressly note safety as a concern, it does indicate that the trainman plays a pivotal role in the safe operation of the railroad.

Because the Court concludes Nall could not perform the essential functions of his position, it must now determine whether a reasonable accommodation by BNSF would have afforded him the opportunity to do so. The Court likewise answers this question in the negative. As BNSF alleges, given the daily duties of a trainman and the safety-critical nature of the position, the only way it could have allowed Nall to continue in that position safely would have been for the company to assign another employee to shadow him. *See* Doc. 39 at 19. However, the ADA is not so demanding of an employer. Accordingly, the Court concludes that despite his prior years of service and his treating physician's statements to the contrary, Nall was not qualified to perform the essential functions of his job. However, even assuming the Court has erred in this determination and Nall was in fact qualified, BNSF would still be entitled to summary judgment, because as discussed below, Nall cannot show pretext and the direct threat defense squarely applies in this case.

### 3.  Adverse employment action

The third element Nall must establish is that he was subjected to an adverse employment action on account of his disability. *Cannon*, 813 F.3d at 590. The ADA prohibits discrimination on "the basis of disability" with respect to the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To make this showing of causation, the plaintiff need not show that discrimination is the sole reason for the adverse employment decision, only that it

actually played a role in the employer's decision making process and had a determinative influence on the outcome. *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 479–80 (5th Cir. 2016) (citing *LHC Grp.*, 773 F.3d at 702).

"In the context of discrimination claims under the ADA, the Fifth Circuit has limited adverse employment actions to acts which affect compensation, duties, and benefits." *Carthren v. RT Bossier Hotel Partners*, Civ. Action No. 07–2043, 2009 WL 57106, at *4–5 (W.D. La. Jan. 8, 2009) (citing *McKay v. Johanns*, 265 Fed. App'x 267, 268–69 (5th Cir. 2008)). Under this standard, to establish a prima facie case of discrimination, a plaintiff must show that she was subject to an ultimate employment decision, such as hiring, granting leave, discharging, promoting, or compensating. *Id.* (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004)). "Placement on paid leave is not an adverse employment action . . . without an additional showing of loss to Plaintiff's compensation, duties, or benefits." *Butler v. Exxon Mobil Corp.*, 838 F. Supp. 2d 473, 491 (M.D. La. 2012) (citing *McCoy*, 492 F.3d at 559; *Watkins v. Paulsen*, 332 Fed. App'x 958, 960 (5th Cir. 2009); *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000)).

Nall argues that he was subjected to an adverse employment decision when BNSF refused to reinstate him even after he submitted MSFs indicating that he could return to work without restrictions. Doc. 38 at 28. BNSF responds that Nall's motion fails on this element because he cannot demonstrate that BNSF did not review the MSFs, and in fact, there is evidence to the contrary. Doc. 42 at 17. BNSF also argues that Nall cannot demonstrate causation because he fails to produce evidence that BNSF decided to not review the MSFs because of his disability. *Id.* at 18. Finally, BNSF contends that whether and to what extent BSNF reviewed two "unremarkable medical records out of many does not constitute an ADA violation." *Id.* at 18–19.

Initially, the Court notes that contrary to BNSF's assertion regarding causation, the standard under the ADA requires only that discrimination "'actually play[ed] a role in the employer's decision making process and ha[d] a determinative influence on the outcome,'" not that it was the sole, but-for cause. *Pinkerton*, 529 F.3d at 519 (quoting *Soledad*, 304 F.3d at 503–04)). More importantly, however, while the record is not clear as whether Nall actually suffered a loss of compensation (and in fact appears to indicate that he was still collecting paid leave at the relevant times), *see* Doc. 38-42, the Court easily concludes that the decisions not to reinstate him affected his duties since he was precluded from working. Accordingly, Nall has established the third element of his prima facie case.

### c.  Legitimate, non-discriminatory reason

If an employee establishes his prima facie case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). The determination that a defendant has met its burden at this stage can involve no credibility assessment. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). Nonetheless, "[a]s the ultimate issue is the employer's reasoning *at the moment* the questioned employment decision is made, a justification that *could not* have motivated the employer's decision is not evidence that tends to illuminate this ultimate issue and is therefore simply irrelevant at this stage of the inquiry." *Patrick v. Ridge*, 394 F.3d 311, 319 (5th Cir. 2004) (citations omitted). Thus, both post-decision and pre-decision incidents that the employer was unaware of cannot be the basis of the employer's decision. *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015).

The parties do not address this stage of the *McDonnell-Douglas* inquiry with regard to

Nall's discrimination claim. *See* Docs. 38, 39, 41, 42. Nevertheless, the Court is of the opinion that BNSF has met its burden. In making its arguments as to the applicability of the direct-threat defense, BNSF repeatedly states—and the record corroborates—the company's concerns that Nall could not safely perform his duties. Safety concerns are a legitimate, non-discriminatory reason for BNSF's decision to place and keep Nall on medical leave. *See Martin v. Bayland Inc.*, 181 Fed. Appx. 422, 424 (5th Cir. 2006) (per curiam) (unpublished) ("The district court did not err in considering safety as one of Bayland's legitimate, nondiscriminatory reasons.").

### d. Pretext

"Once the employer offers a legitimate, nondiscriminatory reason for the plaintiff's treatment, the presumptions of the *McDonnell-Douglas* framework dissipate, and the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination." *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007) (citations omitted). To carry this burden, a plaintiff must produce substantial evidence that each of the employer's proffered reasons for its actions were a pretext for discrimination. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) (citation omitted). Pretext can be demonstrated by showing that a discriminatory motive more likely motivated an employer's decision, such as through evidence of disparate treatment, or that the employer's explanation is false or unworthy of credence. *Id.* (citations omitted). However, just as in his prima facie case, in attempting to establish pretext a plaintiff cannot solely rely on his subjective belief that discrimination has occurred. *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997).

As with the previous step in the *McDonnell-Douglas* framework, neither party specifically addresses pretext. Nevertheless, in his response to BNSF's motion for summary judgment, Nall alleges that misrepresentations to the EEOC and inconsistencies in testimony

preclude summary judgment in BNSF's favor and cites a case that says a court may infer pretext where a defendant provides inconsistent or conflicting explanations for its conduct. Doc. 41 at 15–16. Elsewhere, Nall alleges that BNSF violated its own policy/practice in ignoring his December 2012 and June 2013 MSFs. Docs. 38 at 28, 41 at 19. The Court construes these allegations as being directed at the question of pretext.

Admittedly, inconsistent explanations for employment decisions can permit an inference of pretext. *Gee v. Principi*, 289 F. 3d 342, 347–48 (5th Cir. 2002). Thus, a jury may view erroneous statements in an EEOC position statement as circumstantial evidence of discrimination. *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013) (citations omitted). The courts have also found an employer's rationale "suspect" where it had "not remained the same" between the time of the EEOC's investigation and the ultimate litigation. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 415 (5th Cir. 2007).

In this case, the Court does not believe that the proffered evidence raises a question of material fact as to whether BNSF's stated reason was pretextual. The only potential inconsistency in Kim Cummings's ("Cummings") (the employee who communicated with the EEOC) response to the EEOC is that BNSF received no additional medical information from Nall's physician between November 27, 2012, and July 3, 2013. Doc. 38-27 at 5. However, BNSF does not deny that additional medical information was received during that time. Indeed, it admits that it was and the record confirms this. *See* Docs. 46 at 10, 38-7 at 1. Cummings's testified that her response assimilated information from a number of individuals and her earlier statement to the EEOC was based on reports from only one individual. Doc. 41-20 at 11. Moreover, in a later response to the EEOC, Cummings clarified that "to date, no evidence of Mr. Nall's current status has been provided to BNSF *to indicate that his condition has significantly*

*improved since this field test was performed.*" Doc. 38-28 at 7 (emphasis added). Although the record confirms that Cummings's first response was inaccurate as stated, in light of the second statement and considering the circumstances surrounding the compilation of the report, as well as the fact that BNSF does not dispute that it did in fact receive Nall's MSFs, the Court does not believe Cummings's statement to the EEOC demonstrates pretext.

Further, although relevant to the question of pretext, an employer's "disregard of its own hiring system does not of itself conclusively establish that improper discrimination occurred or that a nondiscriminatory explanation for an action is pretextual." *Risher v. Aldridge*, 889 F.2d 592, 597 (5th Cir. 1989) (citations omitted). Nor does "[p]roof that an employer did not follow correct or standard procedures." *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 819 (5th Cir. 1993). Rather, to make out his claim, a "plaintiff must establish the existence of discrete facts that show some nexus between the employment actions taken by the employer and the employee's [status]." *Id.*

Here, Nall has not done so. First, based on the company's voluminous OPUS records and witness testimony, the Court is not convinced that Nall has demonstrated that BNSF did not review these documents. More importantly, Nall presents no evidence to illustrate that BNSF's alleged failure to review these two documents—out of the many it did review—was done in a discriminatory manner. *See Risher*, 889 F.2d at 597 (rejecting plaintiff's pretext claim on the basis of employer's alleged failure to follow its own procedures because "even if Bobbitt did erroneously fail to 'use' the objective appraisals in his promotion decisions, there was absolutely no evidence presented that he did so in a sexually discriminating manner."). Accordingly, the Court does not believe that Nall has met his burden to demonstrate pretext.

### e. Affirmative defenses: direct threat and business necessity

The ADA contains a broad prohibition against the discriminatory use of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(6). One type of defined "qualification standard" is "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." *Id.* § 12113(b). Another is the use of medical examinations and inquiries except in certain circumstances. *Id.* § 12112(d).

The statue goes on to clarify the parameters of the qualification-standard prohibition, stating:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation.

*Id.* § 12113(a); *See also id.* § 12112(b)(6) (prohibiting such standards and tests "unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity."). In light of this language, two affirmative defenses have arisen from the aforementioned provision: direct threat and business necessity.

Because direct threat is defined as a qualification standard, the ADA does not protect those who pose a direct threat to the health and safety of herself or others in the workplace provided that the health and safety standards imposed are "job-related and consistent with business necessity." *Id.* § 12113(a)–(b). Likewise, current employees are shielded from employer medical examinations and inquiries aimed at determining "whether such employee is an

individual with a disability or as to the nature or severity of the disability, *unless* such examination or inquiry is shown to be job-related and consistent with business necessity." *Id.* § 12112(d)(4) (emphasis added). Thus, the ADA does not protect an employee from an employer's imposition of a safety standard or medical examination so long as the standard or inquiry is "job-related and consistent with business necessity." *Id.* § 12113(a).

While both defenses hinge on the requirements that the standards be "job-related" and "consistent with business necessity," there are noted differences between the two. Notably, "the direct threat test applies in cases in which an employer responds to an individual employee's supposed risk that is not addressed by an existing qualification standard." *EEOC v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000). In other words, "business necessity applies to across-the-board rules, while direct threat addresses a standard imposed on a particular individual." *Id.* at 873. Thus, an employer may defend a qualification on either ground, depending on the nature of the qualification standard. *Id.* at 875. However, because direct threat and business necessity are affirmative defenses, it is the employer's burden to establish the applicability of these defenses. *Atkins v. Salazar*, 677 F.3d 667, 681 (5th Cir. 2011) (per curiam) (citations omitted).

### 1. Direct threat

A direct threat is a "significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 42 U.S.C. § 12111(3); 29 C.F.R. § 1630.2(r). The decision that an individual creates a direct threat must depend on an individualized assessment of the safety risks the disabled individual actually poses. *Kapche*, 304 F.3d at 500. Such an assessment must consider factors such as: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." 29 C.F.R. § 1630.2(r).

In other words, an "employer must determine whether a reasonable accommodation would either eliminate the risk or reduce it to an acceptable level." *Champ v. Balt. Cnty.*, 884 F. Supp. 991, 998 (D. Md. 1995) (citing 29 C.F.R. § 1630, App. § 1630.2(r)).

Nall alleges that BNSF ran afoul of the regulations because its direct-threat determination did not focus on the most current medical knowledge since his MSFs were ignored. Docs. 38 at 29, 41 at 17–21. However, the applicable regulations instruct that a direct-threat determination "shall be based on a reasonable medical judgment that relies on the most current medical knowledge *and/or* on the best available objective evidence." 29 C.F.R. § 1630.2(r) (emphasis added). Because of this disjunctive construction, only one is necessary. *See Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1090 (10th Cir. 1997) ("29 C.F.R. § 1630.2(r) does not require an independent medical examination when the available objective evidence is clear. It uses the conjunctive 'and/or' between medical knowledge and objective evidence."); *EEOC v. BNSF Ry. Co.*, 2016 WL 98510, at *8 ("BNSF may not have been able to access 'the most current medical knowledge' about Mr. Holt's back condition unless it was willing to pay for it, but it could make the assessment based on the 'best available' evidence—i.e., the objective information it could glean from the medical examination its contractor had already performed and the records Mr. Holt was able to provide."). As a result, Nall's argument fails. First, the record does not conclusively demonstrate that BNSF ignored the MSFs. However, even if it did, the record is replete with objective medical evidence on which the company relied in making its decision.

The Court also concludes that the direct-threat factors weigh in BNSF's favor. In making a direct-threat determination, all of the factors are considered; however, there is no precise mathematical formula for imposing liability. *See Atkins*, 677 F.3d at 682–83 (noting that although there was only a "small risk" that the plaintiff would experience hyperglycemia while

carrying out his safety-sensitive law enforcement duties, the remaining factors were sufficient to grant summary judgment). Rather, "[t]he acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example." *Exxon Corp.*, 203 F.3d at 875. Under this framework, courts routinely uphold a defendant's direct-threat defense when a plaintiff does not pose an immediately imminent risk, but for whom even a momentary lapse in condition could have disastrous consequences. *See, e.g.*, *Hickman*, 2012 WL 9100358, at *8 (noting that the nature and severity of the potential harm was "very high" because thousands of people and the surrounding environment could be at risk if plaintiff suffered a seizure at work); *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 88687 (9th Cir.2001) ("a significant physical or mental lapse by [plaintiff] as a result of a diabetic episode could result in substantial harm to his co-workers and others."); *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 661 (7th Cir. 2005) (plaintiff with uncontrolled diabetes and a resulting risk of passing out on the job presented a direct threat where employees were required to climb tall ladders, operate dangerous machinery, and help lift 80–pound pieces of fiberboard in a hot environment).

The record here clearly demonstrates that Nall's position was safety critical. On a daily basis he worked around trains and was responsible for their safe and efficient operation. Even though he may not have posed an imminent risk, it is beyond dispute that railroad employees "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 628 (1989) (citations omitted).

Nall also alleges that he was not a direct threat on the basis of Jankovich's work releases and his own subjective belief that he could perform his job safely. Doc. 41 at 17–21. However,

Nall's bare assertion that he was capable of performing all of the essential elements of his job safely is insufficient to defeat a motion for summary judgment. *Hickman*, 2012 WL 9100358, at *10 (citing *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005)). Moreover, in making a "reasonable medical judgment," there is no requirement that an employer disregard its own doctors' conclusions or give greater weight to the plaintiff's treating physician. *Id.* at *9; *Wurzel v. Whirlpool Corp.,* No. 10–3629, 2012 WL 1449683, at *16 (6th Cir. April 27, 2012). Indeed, the employer's doctors may very well be justified in discounting the conclusions of other treating physicians based on their review of the employee's medical record as a whole. *See Hickman*, 2012 WL 9100358, at *9 (finding that it was reasonable for the employer to discount the plaintiff's physician's release based on the record as a whole); *Wurzel*, 2012 WL 1449683, at *16 (finding that employer was entitled to favor its physician's recommendation over the plaintiff's cardiologists because they did not have current and complete information when making their recommendations). Accordingly, an employer need not show that no reasonable jury could find that the employee could safely return to work—only that "no reasonable jury could find [the company and its doctors] acted unreasonably when making its individualized determination of a [plaintiff's] ability to safely work." *Hickman*, 2012 WL 9100358, at *9 (citing *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 86 (2002); *Wurzel*, 2012 WL 1449683, at *13). Here, BNSF did just that. Its physicians determined—based on the record as a whole, including coworker observations, a field test, and numerous medical reports—that Nall posed a safety risk. It was thus entitled to disregard Jankovich's releases, which, in contrast, were based on a limited set of observations and "incomplete set of facts." *Id.*

Even in cases where medical experts disagree in their assessment of the extent of a real risk of serious harm or death, Congress did not intend that the courts should make the final

medical decision. *Knapp v. Nw. Univ.*, 101 F.3d 473, 485 (7th Cir. 1996). "Instead, in the midst of conflicting expert testimony regarding the degree of serious risk of harm or death, the court's place is to ensure that the exclusion or disqualification of an individual was individualized, reasonably made, and based upon competent medical evidence." *Id.* The Court has done just that, and concludes that BNSF has demonstrated through its own individualized assessment and based on the available objective evidence before it that Nall was a direct threat.

Nevertheless, the analysis does not end here. When there is no genuine issue of material fact as to whether a plaintiff was a direct threat, he can still defeat the employer's motion for summary judgment by producing probative evidence that reasonable accommodations were available. *Hickman*, 2012 WL 9100358, at *10. In this case, however, Nall points to no probative evidence suggesting that BNSF could have accommodated his Parkinson's. In a similar case involving an epileptic plaintiff working in a safety-critical environment, the court stated:

> By its nature, the PT position involves working with hazardous materials and equipment. It would therefore be impossible for ExxonMobil to eliminate this aspect of its work environment, and the ADA does not require that an employer relieve an employee of any essential functions of her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so.

*Hickman*, 2012 WL 9100358, at *10 (citing *Burch v. City of Nocogdoches*, 174 F.3d 615, 621 (5th Cir. 1999)). Like the plaintiff's job in *Hickman*, Nall's position is safety critical. *See Skinner*, 489 U.S. at 628 (noting that railroad employees "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences."). Moreover, as already discussed, having someone shadow Nall or take over some of his duties is not reasonable accommodation.

## 2.  Business Necessity

The ADA also provides employers a "business necessity" defense for the imposition of

certain qualification standards or criteria—including medical examinations and fitness-for-duty tests. 42 U.S.C. §§ 12112(d); 12113(a). However, any employer-ordered examination must be restricted to discerning whether an employee can perform the essential functions of his or her job. 29 C.F.R. § 1630.14(c). To successfully defend a qualification standard on the basis of the business-necessity defense, an employer must prove by a preponderance of the evidence that such standards are: "(1) uniformly applied; (2) job-related for the position in question; (3) consistent with business necessity; and (4) cannot be met by a person with plaintiff's disability even with a reasonable accommodation." *Atkins*, 677 F.3d at 681–82 (citation omitted).

A qualification is "job-related," if the employer demonstrates that the qualification standard is necessary and related to "the specific skills and physical requirements of the sought-after position." *Id.* (citation and internal quotation marks omitted). "Similarly, for a qualification standard to be 'consistent with business necessity,' the employer must show that it substantially promotes the business's needs." *Id.* (citation omitted). Thus, "physical requirements . . . such as lifting, walking or seeing are acceptable defenses as long as the requirements are job-related and consistent with business necessity." *Exxon Corp.*, 203 F.3d at 874 (citing 29 C.F.R. pt. 1630, App. § 1630.10). Nevertheless, "[r]equirements that may be valid as a business necessity must be 'established' by the employer to be eligible for the position." *Id.* (citing 29 C.F.R. § 1630.2(q)). Concerning safety-based qualification standards, the Fifth Circuit has elaborated that:

> In evaluating whether the risks addressed by a safety-based qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence. The acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example. In short, the probability of the occurrence is discounted by the magnitude of its consequences.

*Id.* at 875.

BNSF's original letter notifying Nall of its decision to place him on leave stated that he was "observed having difficulty getting on and off engines as a result of stumbling as well as displaying a lack of concentration when receiving mandatory directives from dispatchers." Doc. 38-23. Nall seizes on the letter's mention of "balance and concentration" to argue that BNSF's field test and subsequent evaluations of his medical record violated the medical-examination requirements of the ADA because it went beyond focusing on these two issues. Doc. 38 at 18–22. He also complains that there were no other subsequent witnesses or documentation to suggest problems with his concentration or cognitive abilities in the workplace that would justify BNSF's decision to pull him from active duty. Doc. 38 at 18.

The Court disagrees. Nall's field test evaluated him on the basis of balance, concentration, and safety issues. That he was later told that he was not safe to return to work because he committed safety violations during the test rather than had balance or concentration issues is irrelevant. BNSF's concerns clearly related to his job as a trainman: he was responsible for the safe and efficient movement of trains and to that end, spent time on the track and around dangerous equipment on a daily basis. Conducting a field test in which he was evaluated on both safety and observed balance and concentration issues is consistent with business necessity because it was conducted to ensure that the workplace was safe and secure.

Accordingly, even if Nall could establish his prima facie case, the Court concludes that BNSF is entitled to summary judgment on his disability discrimination claim. There is no question of material fact that Nall was a direct threat and that the tests and standards he was subjected to were job related and consistent with business necessity.

### C.  Age Discrimination Claim

#### i.     The parties' contentions

BNSF moves for summary judgment on Nall's ADEA claim, arguing that he cannot show that he was "qualified" or there was a causal connection between BNSF's decision to place and keep him on leave and his age. Doc. 39 at 32. According to BNSF, the only evidence Nall has to support his age-discrimination claim is his contention that Wilks and Dickey asked him about his retirement plans and his subjective belief that his age was the reason behind the decision to place him on medical leave. *Id.* at 32–34. BNSF further contends that even if he could make out a prima facie case, Nall cannot prove that BNSF's stated reasons for placing him on leave are pretextual and his age was the real reason for the decision. *Id.* at 34.

Nall responds that he has presented four pieces of evidence that are probative of unlawful age discrimination and preclude summary judgment on his ADEA and THRC claims because they indicate that "his age was at least a motivating factor in the adverse decisions, and therefore a question for the jury." Doc. 41 at 22. These are: (1) Wilks and Dickey's queries about his retirement plans, (2) the statistical age data he presents, which indicates the average and median ages of similarly situated employees at the Galveston yard were 42 and 41, respectively (3) the EEOC's determination letter, and (4) BNSF's misrepresentations to the EEOC. Doc. 41 at 21–22.

BNSF replies that the evidence on which Nall relies to show that BNSF employees asked him about his retirement plans is actually his own testimony, and therefore—contrary to Nall's assertions otherwise—there was no admission by BNSF that such comments were made. Doc. 46 at 14. BNSF further argues that, even if they were made, such comments are not evidence of age discrimination under Fifth Circuit precedent. *Id.* With regard to Nall's statistical evidence, BNSF

avers that the Court should disregard it because "raw information about the average and median age of BNSF's train service employees is meaningless without expert testimony analyzing and explaining those numbers in light of all relevant and available information." *Id.* at 14–15. BNSF also calls the Court's attention to the fact that Nall cites no cases to support his argument that an age-discrimination plaintiff can avoid summary judgment any time the average age of the employer's workforce is younger than the plaintiff himself. *Id.* at 15. Finally, BNSF urges that "Nall's view that statements by an EEOC investigator can in the least affect summary judgment is legally wrong." *Id.* at 14.

### ii.    The legal framework: the ADEA and TCHRA

The ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, under the TCHRA, an employer "commits an unlawful employment practice" if the employer fails or refuses to hire or "discriminates in any other manner" against an individual "because of" the individual's age. Tex. Lab. Code § 21.051. Accordingly, the TCHRA is coextensive with the ADEA and claims are evaluated in the same analytic framework—with one exception. *See Julian v. City of Houston*, 4:12-CV-2973, 2014 WL 3795580, at *4–5 (S.D. Tex. July 31, 2014) (explaining the similarities and differences between the ADEA and TCHRA's evidentiary frameworks), *aff'd*, 618 Fed. App'x 211 (5th Cir. 2015). The TCHRA differs from the ADEA in the causation standard: the ADEA requires evidence that age was the "but-for" cause of the adverse action, while the TCHRA applies a less strict standard, i.e., that age was a "motivating factor" in the adverse decision. *Compare Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) ("[U]nder § 623(a)(1), the plaintiff retains the burden

of persuasion to establish that age was the 'but-for' cause of the employer's adverse action."), *with Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) ("'[A] motivating factor' is the correct standard of causation for the plaintiff in all TCHRA unlawful employment practice claims.").

Under both statutes, a plaintiff may prove a claim of age discrimination with either direct or circumstantial evidence. *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010) (citation omitted); *Quantum Chem. Corp.*, 47 S.W. 3d at 476–77. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir 2003) (quoting *Sandstad*, 309 F.3d at 897). It includes any statement or document which shows on its face that an improper criterion served the basis for the adverse employment action. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003), *overruled on other grounds by Smith v. Xerox Corp.*, 602 F.3d 320, 328 (5th Cir. 2010). "If an inference is required for the evidence to be probative as to [an employer's] discriminatory animus in terminating [the former employee], the evidence is circumstantial, not direct." *Sandstad*, 309 F.3d at 897–98.

Workplace remarks may constitute direct evidence of discrimination if they are (1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the complained-of adverse employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue. *CSC Logic, Inc.*, 82 F.3d at 655 (citation omitted), *abrogated on other grounds by Reeves*, 530 U.S. 133. "In order for an age-based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was a determinative factor in deciding to terminate the

employee." *Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000) (citing *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996)).

When there is no direct evidence of age discrimination, the burden-shifting framework of *McDonnell Douglas* applies. *Sandstad*, 309 F.3d at 896. In order to establish a prima facie case of discrimination under the ADEA, a plaintiff must show that he is (1) qualified; (2) adversely affected by the employer's decision; (3) within the protected class at the time of the decision; and (4) either replaced by someone younger, or otherwise discharged because of his age. *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993) (citation omitted). In the case of the ADEA, those individuals who are at least forty years old are considered to fall within the protected class. 29 U.S.C. § 631.

If the plaintiff submits direct evidence of discriminatory animus or establishes a prima facie case, the burden then shifts to the employer to come forward with a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802. Importantly, at this stage, the defendant's burden is "one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 509). If the defendant successfully produces such evidence, the presumption of discrimination falls away, and the burden shifts back to the plaintiff. *Id.* at 142–43.

It is at this point that the evidentiary framework between the statutes diverges. Under the TCHRA, "[t]he plaintiff, who always carries the ultimate burden, 'must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative).'" *Assariathu v. Lone Star*

*Health Mgmt. Assocs., LP*, 516 F. App'x 315, 319 (5th Cir. 2013) (unpublished) (alteration in original) (quoting *Rachid*, 376 F.3d at 312 (citation and internal quotation marks omitted)). However, because a plaintiff must prove age discrimination was the "but-for cause" of a challenged employment decision, this "mixed-motive" analysis is no longer permitted under the ADEA. *See Gross*, 557 U.S. at 176–78 (precluding mixed-motive analysis in ADEA cases).

### iii.   Analysis

The Court finds that the alleged comments regarding Nall's retirement plans fail the test for direct evidence of discrimination. Nall does not specify when these comments were made. More importantly, he admits that Dickey was not responsible for reviewing medical information to determine whether an employee was safe to return to work and she was not involved in determining fitness for duty for Nall. Doc. 38 at 15. While he does allege that Wilks did fitness-for-duty evaluations, Nall does not allege that Wilks had authority over the employment decision. *See* Doc. 38. Moreover, Wilks herself testified that she was not the one who placed Nall on leave, decided to conduct either the 2012 or 2015 field tests, or made the decision to keep Nall on leave after the December 2012 and June 2013 MSFs came in. *See* Doc. 38-34. In the absence of evidence demonstrating that these comments were proximate in time to BNSF's decision to place and keep Nall on leave or that Dickey or Wilks had the authority or influence to terminate him, this testimony does not constitute direct evidence of age discrimination. *See Acker v. Deboer, Inc.*, 429 F. Supp. 2d 828, 839 (N.D. Tex. 2006) (finding comments insufficient to constitute direct evidence because there was absence of evidence showing proximity and influence). Accordingly, Nall must proceed under *McDonnell Douglas*.

Here, only the second and fourth elements of Nall's prima facie case are contested. Nall easily establishes the first element. He was 61 at the time he was placed on leave. Doc. 41 at 13;

*see* 29 U.S.C. § 631. With regard the second element, for the reasons already discussed in the context of Nall's disability discrimination claim, the Court concludes that Nall was not qualified. His prima facie case thus fails.

However, even if he could establish a prima facie case, BNSF articulates a legitimate, non-discriminatory reason for placing and keeping him on leave—that he posed a safety risk to himself and others. Accordingly, Nall must rebut this reason and demonstrate that his age was the "but-for" cause of the decision as required for liability under the ADEA, or a "motivating factor" for TCHRA liability.[3]

"An employer's inquiry into an employee's retirement plans is not by itself evidence of discriminatory intent." *Rexses v. The Goodyear Tire & Rubber Co.*, 401 Fed. App'x 866, 869 (5th Cir. 2010) (citing *Moore*, 990 F.2d at 818). However, such remarks can be provided as circumstantial evidence alongside other alleged discriminatory conduct. *Reed*, 701 F.3d at 441 (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000)). In such cases courts apply a more flexible two-part test than that used when the same comments are offered as direct evidence of discrimination. *Id.* "In that circumstance, a plaintiff need only show (1) discriminatory animus on the part of the speaker who (2) is either primarily responsible for the challenged employment action or has influence or leverage over the relevant decisionmaker." *Id.* (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003)).

Here, Nall does not allege that Wilks or Dickey had discriminatory animus. Nor does he allege that they were primarily responsible for the decision to place and keep him on leave. Moreover, as already discussed, the record is devoid of any evidence to support either

---

[3] In his response to BNSF's Motion for Summary Judgment, Nall argues that "his age was at least a motivating factor in the adverse decisions, and therefore a question for the jury." Doc. 41 at 22. Nall clearly misunderstands that, as explained, the ADEA and TCHRA have different causation standards.

proposition. Thus, these alleged comments fail to raise a question of pretext.

Statistical evidence can also be relevant to the issue of pretext. *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1137 (5th Cir. 1983) (citing *McDonnell Douglas*, 411 U.S. at 805). However, the United States Supreme Court has warned, statistics "come in infinite variety" and "their usefulness depends on all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977) (citation omitted). The Fifth Circuit has likewise cautioned that because "statistical evidence has no magical properties," the "district court should consider the extent to which it reasonably supports the theory that the proponent advances." *Williams v. Gen. Motors Corp.*, 656 F.2d 120, 130 n.14 (5th Cir. 1981). That court has also stated that "statistics may be deceptive, '[p]articularly in age discrimination cases where innumerable groupings of employees are possible according to ages and divisions within the corporate structure.'" *Atkins v. Coltec Indus., Inc.*, No. 93-1641, 1994 WL 487238, at *4 (5th Cir. Aug. 18, 1994) (per curiam) (unpublished) (alteration in original) (quoting *Walther v. Lone Star Gas Co.*, 952 F.2d at 124).

Here, Nall simply includes a list of all the BNSF train master employees in the Gulf division and then reports what the average and median ages of employees are (42 and 41, respectively). First, the Court notes that the fact that the median age is 41 indicates that over half of BNSF's train-master employees are covered under the ADEA. *See* 29 U.S.C. § 631. Second, Nall provides no context for his data. Without this, the Court is of the opinion that Nall's statistical evidence falls far short of showing that "but-for" his age, Nall would not have been placed and kept on leave. *See Zahorik v. Cornell Univ.*, 729 F.2d 85, 95 (2d Cir. 1984) (concluding that gross statistics are meaningless absent a specialized breakdown and "[m]ore particularized evidence relating to the individual plaintiffs is necessary to show discriminatory

treatment."). The Court also concludes that this statistical evidence is not enough to show that, under the TCHRA, age was a "motivating factor" in placing and keeping Nall on leave.

With regard to Nall's reliance on the EEOC determination letter, the Fifth Circuit has made it abundantly clear that a "district court . . . is not bound by the EEOC's determination of reasonable cause" and a "determination is not sufficient to defeat summary judgment where the determination is not supported by the summary judgment evidence." *Cruz v. Aramark Servs., Inc.*, 213 Fed. App'x 329, 335 (5th Cir. 2007) (citations omitted). Finally, in the context of his discrimination claim above, the Court has already illustrated how Nall's claims that certain misrepresentations to the EEOC demonstrate pretext falls short. For the foregoing reasons, BNSF is likewise entitled to summary judgment on Nall's age-discrimination claim.

### D. Retaliation

#### i. The parties' contentions

BNSF argues that summary judgment is proper on Nall's retaliation claim because he cannot prove a causal connection between his protected activity (his filing of the EEOC charge of discrimination) and the complained-of action (keeping him on leave). Doc. 39 at 31. Instead, BNSF alleges that Nall admits he has no evidence to support his retaliation claim and no one at BNSF has ever said anything negative about his filing the EEOC charge with the exception of Wilks's statement that she "had to watch what-all she said around [Nall] 'cause [he] filed a discrimination, or whatever." *Id.* Moreover, even could he establish a prima facie case, BNSF asserts that Nall could not overcome BNSF's stated legitimate, non-retaliatory reason for its decision to place and keep Nall on leave. *Id.*

Nall responds that his retaliation claim is based on the filing of the EEOC charge and the agency's investigation. Doc. 41 at 22. He avers that Gillis needed much less information to

attempt to reinstate Nall than she told the EEOC. *Id.* Therefore, the argument goes, had Nall not filed his charge of discrimination with the EEOC, "it is possible that BNSF could have taken appropriate measures earlier in order to attempt to reinstate Nall." *Id.* It is "[t]his fact, coupled with BNSF's misrepresentations made to the EEOC" that "indicate there is a fact question as to whether BNSF retaliated against Nall." *Id.*

In reply, BNSF contends that Nall essentially abandons his retaliation claim because he only devotes one small paragraph to defending it and admits that he has no evidence to support it. Doc. 46 at 13. BNSF also avers that Nall's claim is doomed because he neither explains how BNSF's alleged false statements to the EEOC are evidence of retaliation nor presents evidence to demonstrate that BNSF's stated reason for placing and keeping Nall on leave is a pretext for retaliation. *Id.*

### ii.    The legal framework

The ADA, ADEA, and THCRA also prohibit an employer from taking an adverse employment action against an employee because she filed an employment discrimination charge or took other similarly protected action. *Munoz v. Seton Healthcare, Inc.*, 557 Fed. App'x 314, 321 (5th Cir. 2014) (per curiam) (unpublished) (collecting cases). These statutes do "not prohibit all retaliation, but rather those employment actions that are 'materially adverse, one[s] that would dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vicknair v. La. Dep't of Pub. Safety & Corr.*, 555 F. App'x 325, 330–31 (5th Cir. 2014) (per curiam) (unpublished) (alteration in original) (quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009).

As with discrimination claims, if there is no direct evidence of retaliation—as in this case—the analysis proceeds according to the *McDonnell Douglas* framework outlined above.

*Fierros v. Tex. Dept. of Health*, 274 F.3d 187, 191 (5th Cir. 2001), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). In the retaliation context, a plaintiff establishes a prima facie case by showing "(1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) there was a causal link between the protected activity and the adverse employment action." *Assariathu*, 516 F. App'x at 322 (internal quotation marks omitted) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012)).[4]

Retaliation claims are subject to the "but for" causation standard. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *Ptomey v. Tex. Tech Univ.*, 277 S.W.3d 487, 497 (Tex. App.—Amarillo 2009, pet. denied) (citations omitted). As a result, in assessing pretext in the retaliation context, no "mixed-motive" analysis is permissible. *Nassar*, 133 S. Ct. at 2534. However, the Fifth Circuit has explained that "[a]t the prima facie stage, 'the standard for satisfying the causation element is much less stringent than a but for causation standard.'" *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (quoting *Fierros*, 274 F.3d at 191). Consequently, "a plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case." *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) (citing *De Anda v. St. Joseph Hosp.*, 671 F.2d 850, 857 n.12 (5th Cir. 1982)). "Nevertheless, the plaintiff must produce *some* evidence of a causal link between the protected activity and the adverse employment action to establish a prima facie case of retaliation." *Id.* (citing *Fierros*, 274 F.3d at

---

[4] There is some question as to whether the Fifth Circuit's decision in *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 260 (5th Cir. 2001), which added a fourth element to an ADEA retaliation case—that the employee be qualified—still makes sense in the wake of *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), though the consensus seems to be that it does not. *See Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 497 n.2 (5th Cir. 2015).

191).

### iii.  Analysis

Here, the Court agrees with BNSF that Nall has failed to carry his burden to show a genuine issue of material fact exists as to his retaliation claim. Nall has failed to adduce any evidence demonstrating a causal link between the filing of his EEOC charge on December 20, 2012, and BNSF's decision to keep him on leave. Moreover, even if Nall could establish a prima facie case, as already discussed in the context of his discrimination claim, he has presented no evidence to rebut BNSF's legitimate, non-discriminatory reason for keeping him on leave, namely that he presented a safety risk to himself and others. Accordingly, BNSF's Motion for Summary Judgment is granted and Nall's retaliation claim is also dismissed with prejudice.

## IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Nall's Motion to Strike, Doc. 40, is **DENIED**. It is further

**ORDERED** that Nall's Motion for Summary Judgment, Doc. 38, is **DENIED** and BNSF's Motion for Summary Judgment, Doc. 39, is **GRANTED**. The case will be dismissed by separate order.

SIGNED at Houston, Texas, this 14th day of February, 2017.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE